SCOTT, APPELLANT, *v.* THE NEWS-HERALD ET AL., APPELLEES.

[Cite as Scott *v.* News-Herald (1986), 25 Ohio St. 3d 243.]

(No. 84-274—Decided August 6, 1986.)

*Brent L. English,* for appellant.

*Wickens, Herzer & Panza Co., L.P.A., David L. Herzer, Richard D. Panza, Richard A. Naegele* and *John J. Hurley, Jr.,* for appellees.

LOCHER, J.   The general issue presented in this appeal is whether summary judgment was properly granted against appellant who avers he was defamed by appellees' column. Because we hold, as a matter of law, that the article in question was opinion, we find for appellees and affirm the court of appeals.

I

This case requires us to reformulate the test and standard in the context of published comment alleged to be defamatory. In *Milkovich* v. *News-Herald, supra,* this court recently dealt with the same article we examine today. For reasons to be expressed herein, we now overrule the holding in *Milkovich* with respect to the characterization of the article. We find the article to be an opinion, protected by Section 11, Article I of the Ohio Constitution as a proper exercise of freedom of the press.

The federal Constitution has been construed to protect published opinions ever since the United States Supreme Court's opinion in *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323. The court stated in *Gertz* at 339-340:

"We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. * * *"

Federal and state courts alike have consistently adhered to the proposition that the free speech and press guarantees protect published opinions. See, *e.g., Orr* v. *Argus-Press Co.* (C.A. 6, 1978), 586 F. 2d 1108; *Meyers* v. *Boston Magazine Co.* (1980), 380 Mass. 336, 403 N.E. 2d 376. Our democratic society is founded upon the freedom to voice objections concerning the status quo, and is dependent upon the interplay of conflicting viewpoints to improve itself and our justice system. See *Orr* v. *Argus-Press Co., supra,* at 1117. The United States Supreme Court has been guided by the "* * * profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open * * *." *New York Times Co.* v. *Sullivan, supra,* at 270. The intent is to avoid self-censorship, whereby overbroad defamation standards result in the stifling of important non-defamatory material. *Gertz, supra,* at 340. These ideals are not only an integral part of First Amendment freedoms under the federal Constitution but are independently reinforced in Section 11, Article I of the Ohio Constitution which reads in pertinent part:

"Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

With these principles in mind we will now review appellant's propositions of law with particularity.

## II

Appellant presents three propositions of law. The first states that "[t]he superintendent of public schools in a local school district in Ohio is not a public official for the purposes of the law of defamation where he is defamed in an article that does not relate to the performance of his official duties and because the position he holds is not such that he has, or appears to the public to have, substantial responsibility for the affairs of government."

In response to this proposition we reiterate the United States Supreme Court's statement in *Rosenblatt* v. *Baer* (1966), 383 U.S. 75, 86:

"* * * Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply."

While distinctions between public figures, public officials, and private figures can be nebulous and difficult to apply, see, *e.g.,* Elder, Defamation, Public Officialdom and the *Rosenblatt* v. *Baer* Criteria—A Proposal for

Revivification: Two Décades After *New York Times Co. v. Sullivan* (1984), 33 Buffalo L. Rev. 579, the distinction is extremely important. See *New York Times Co., supra; Dupler v. Mansfield Journal* (1980), 64 Ohio St. 2d 116 [18 O.O.3d 354].

The rationale underlying the heightened standard of proof for public officials and public figures is that our society encourages uninhibited debate on the performance of public officials and on all public issues. *New York Times Co., supra; Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130. Misstatements and falsehoods are inevitable in any democratic scheme of freedom of expression and debate. Any threat of liability, with regard to the expression of unpopular statements, may result in a "chilling" effect with devastating consequences to a democratic society. Private parties are not made subject to a high standard simply because they do not have the same opportunity to rebut damaging allegations as do those in the public realm.

As superintendent of a municipal public school system, appellant falls within the *Rosenblatt* guidelines. R.C. 3319.01 details the duties of a public school superintendent and provides that "[t]he superintendent of a [city] school district shall be the executive officer for the [school] board. * * *" Clearly, the head of a city school district has substantial responsibilities in the operation of the system. Moreover, the Maple Heights public has a substantial interest in the qualifications and performance of the person appointed as its superintendent.

Because the newspaper in which the alleged libelous statements were contained is of a local circulation, a finding of public official status is particularly strengthened. Controversial actions of a public school superintendent constitute major news in the local paper. A contrary finding would stifle public debate about important local issues. We are therefore compelled to reject as meritless any argument that suggests appellant is merely a "small fish in a big pond" when a local paper is the publishing medium. See *Rosenblatt v. Baer, supra,* at 83 ("The subject matter may have been only of local interest, but at least here, where publication was addressed primarily to the interested community, that fact is constitutionally irrelevant.").

Appellant further argues that the defamation did not relate to his official conduct as school superintendent. This view, however, is inapposite to the entire basis for Diadiun's article:

"When a person takes on a job in a school, whether it be as a teacher, coach, administrator or even maintenance worker, it is well to remember that his primary job is that of educator."

It was precisely because both Milkovich and Scott were authority figures—individuals with substantial impact on their community—that the article was ostensibly written. Diadiun had seen and heard appellant's activities at the wrestling match and the OHSAA hearing. Thus, the averred defamatory remarks arose from events where appellant was acting in an

official capacity as a school superintendent and within the ambit of his responsibilities. Appellant's prior activities and actions while in an official capacity were inextricably bound, in Diadiun's view, to the legal hearing which was the source of his averred perjury.[2] See *Johnston* v. *Corinthian Television Corp.* (Okla. 1978), 583 P. 2d 1101; *Cone* v. *Phipps Broadcasting Stations* (D. Ga. 1979), 5 Media L. Rep. (BNA) 1972; *Grayson* v. *Curtis Publishing* (1967), 72 Wash. 2d 999, 436 P. 2d 756; *Besarich* v. *Rodeghero* (1974), 24 Ill. App. 3d 889, 321 N.E.2d 739, 742; *Reaves* v. *Foster* (Miss. 1967), 200 So.2d 453. In short, appellant's testimony at the legal hearing was related to his official responsibilities at the wrestling match and OHSAA hearing.

In Justice Brennan's dissent, joined by Justice Marshall, to the United States Supreme Court's denial of certiorari in *Lorain Journal Co.* v. *Milkovich* (1985), ____ U.S. ____, 88 L. Ed. 2d 305, several concerns relevant to our present discussion were raised. First, " 'public school teachers may be regarded as performing a task "that goes to the heart of representative government." ' *Ambach* v. *Norwick,* 441 U.S. 68, 75-76 * * * (1979) (quoting *Sugarman* v. *Dougall,* 413 U.S. 634, 647 * * * (1973))." *Id.* at 309. Justice Brennan reiterated the belief at the core of today's decision that the public school teacher exerts a substantial role in shaping a community through his or her impact on the students both as role model and educator. See, also, *San Antonio Independent School Dist.* v. *Rodriguez* (1973), 411 U.S. 1, 29-30; *Wisconsin* v. *Yoder* (1972), 406 U.S. 205, 213; *Brown* v. *Board of Education* (1954), 347 U.S. 483, 493 [53 O.O. 326].

Second, Justice Brennan correctly adduced at 313-314 that "* * * [a] large fight between the students of two rival schools quite legitimately raises serious concerns for the entire community, particularly when, as here, it results in injury to students. * * * To say that Milkovich nevertheless was not a public figure for purposes of discussion about the controversy is simply nonsense." These two points are equally applicable to H. Don Scott in his capacity as superintendent of public schools and therefore ultimately responsible for Milkovich's behavior and the events which transpired at the wrestling match.

Based upon these concerns we cannot, with reflection, be content to rest on the standards related in *Milkovich* v. *News-Herald, supra.* Accord-

---

[2] Appellant's retired status at the time of the legal hearing is thus not germane because the averred defamatory remarks were made in the course of actions arising from official conduct that were, most importantly, matters of import to the community's legitimate interest in a public official's performance of public responsibilities. Justice Brennan in his majority opinion in *Rosenblatt* reiterated the "strong interest in debate on public issues, and * * * a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. Criticism of government is at the very center of the constitutionally protected area of free discussion." *Id.* at 85. It is similarly our view, under Ohio's Constitution, that the subsequent retirement of an individual does not diminish his or her status with respect to the discussion and debate of issues related to a prior status or position.

ingly, we overrule *Milkovich* in its restrictive view of public officials and hold a public school superintendent is a public official for purposes of defamation law.

Because appellant is a public official we now turn to the ramifications of this status upon his cause.

## III

*New York Times Co.* v. *Sullivan, supra,* placed a stricter burden on a defamation plaintiff who is a public official, and required him or her to prove that false statements were made with "actual malice." Actual malice was defined as publishing a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279, 280. This court has followed the stricter *New York Times Co.* standard, stating in *Dupler, supra,* at 119:

"This concept of actual malice has been further refined by subsequent decisions of the United States Supreme Court. Actual malice may not be inferred from evidence of personal spite, ill-will or intention to injure on the part of the writer. *Beckley Newspapers Corp.* v. *Hanks* (1967), 389 U.S. 81, 82; *Rosenblatt* v. *Baer* (1966), 383 U.S. 75, 84. Rather, the focus of [an actual malice] inquiry is on defendant's attitude toward the truth or falsity of the publication, *Herbert* v. *Lando* (1979), 441 U.S. 153, 160; and a public official may recover only upon clear and convincing proof of actual malice. *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, 342; *New York Times, supra,* at pages 285-286. There must be a showing that false statements were made with a 'high degree of awareness of their probable falsity * * *.' *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74.

"Since reckless disregard is not measured by lack of reasonable belief or of ordinary care, even evidence of negligence in failing to investigate the facts is insufficient to establish actual malice. Rather, since 'erroneous statement is inevitable in free debate, and * * * must be protected if the freedoms of expression are to have the "breathing space" that they "need * * * to survive," * * * ' (*New York Times, supra,* at pages 271-72), '[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731."

We see no reason to now abandon this heightened burden of proof for public officials.

## IV

Appellant's second proposition of law is partially predicated upon the assumption that he is a private citizen for defamation purposes and must only meet the ordinary negligence standard set forth in *Embers Supper Club, Inc.* v. *Scripps-Howard Broadcasting Co.* (1984), 9 Ohio St. 3d 22. Accordingly, appellant argues that a summary judgment rendered on the more stringent criteria of actual malice based upon public official status is inappropriate. Because of our resolution of this issue against appellant,

this proposition must fail. The question of *Embers'* continued validity is an issue that must await another day because that issue is not yet squarely before this court.

The record herein, however, supports the determination of the trial court that actual malice could not be established. No evidence was produced which would prove "clearly and convincingly" that appellees made a false statement with a high degree of awareness of probable falsity. To the contrary, as we will discuss in some detail with respect to appellant's final argument, the evidence showed that Diadiun believed his position to be correct, based on his observations and discussions concerning the actions of appellant.

## V

The third and final proposition of law states: "Assertions that an individual lied under oath are not constitutionally privileged expressions of opinion but are instead actionable assertions of fact which are defamatory per se." Appellant posits that this court is bound by *stare decisis* to accept our prior conclusion in *Milkovich* that the allegedly defamatory statements were presented as "fact" and not opinion. We disagree.

## A

In *Milkovich* a majority of this court at that time made the *ex cathedra* statement at 298-299:

"* * * We find that the statements in issue are factual assertions as a matter of law, and are not constitutionally protected as the opinions of the writer. Nothing in the article effectively precautions the reader that the author's statements are merely his considered opinions. The plain import of the author's assertions is that Milkovich, *inter alia,* committed the crime of perjury in a court of law."

It is implicit in the doctrine of *stare decisis* that some principle be established that the public may rely upon with the understanding it will not lightly be overturned. The underlying rationale for *stare decisis* is the importance of constancy and consistency in law. In the absence of consistency and constancy the value of law in society is diminished. We are therefore institutionally bound to uphold our prior decisions where time has vindicated the logic utilized to render the holding. See, *e.g., Hall* v. *Rosen* (1977), 50 Ohio St. 2d 135, 138 [4 O.O.3d 336].

In *Milkovich,* no test was offered and no analysis was given for reaching the conclusion that the article was fact and not opinion. No rule was articulated to support the majority position. Application of *stare decisis* to such a decision is therefore inappropriate in our view and would only engender continued confusion as to what properly constitutes opinion or fact. See *Leavitt* v. *Morrow* (1856), 6 Ohio St. 71, 78 ("* * * A legal principle [precedent], to be well settled, must be founded on *sound reason,* and tend to the purposes of justice. * * * Otherwise, it could never be said

that law is the *perfection of reason,* and that it is the *reason* and *justice* of the law which give to it its *vitality.* * * *"). (Emphasis *sic.*)

Expressions of opinion are generally accorded absolute immunity from liability under the First Amendment. *Trump* v. *Chicago Tribune Co.* (D. N.Y. 1985), 616 F. Supp. 1434, 1435; *Gertz* v. *Robert Welch, Inc., supra,* at 339; *Chaves* v. *Johnson* (Va. 1985), 335 S.E. 2d 97, 102. The determination of whether an averred defamatory statement constitutes opinion or fact is a question of law, properly within our purview today. *Ollman* v. *Evans* (C.A. D.C. 1984), 750 F.2d 970, 978; *Rinsley* v. *Brandt* (C.A. 10, 1983), 700 F.2d 1304, 1309; *Lewis* v. *Time, Inc.* (C.A. 9, 1983), 710 F.2d 549, 553; *Slawik* v. *News-Journal Co.* (Del. 1981), 428 A.2d 15, 17.

In establishing an analytical framework to separate fact from opinion, a number of possibilities are open to us. For example, the federal Ninth Circuit has promulgated a three-part test which holds those statements which "* * * convey pertinent information to the public about a matter of public interest, * * * are made in the course of a public debate or similar circumstances, and * * * are phrased in cautionary language" are opinion. *Murray* v. *Bailey* (N.D. Cal. 1985), 613 F.Supp. 1276, 1282; *Information Control Corp.* v. *Genesis One Computer Corp.* (C.A. 9, 1980), 611 F.2d 781. Another example includes the Restatement of the Law 2d, Torts view, and still others are subjective judgment calls such as *Milkovich, supra.*

After careful consideration of the various standards used to distinguish opinion from fact, it is our holding that a totality of circumstances test be adopted. This test, however, can only be used as a compass to show general direction and not a map to set rigid boundaries.

Consideration of the totality of circumstances to ascertain whether a statement is opinion or fact involves at least four factors. First is the specific language used, second is whether the statement is verifiable, third is the general context of the statement and fourth is the broader context in which the statement appeared. See, generally, *Ollman* v. *Evans, supra,* at 979; *Janklow* v. *Newsweek, Inc.* (C.A. 8, 1985), 759 F.2d 644, 649.

B

Our preliminary concern is with the common meaning of the allegedly defamatory statement. Although specific allegations of criminal conduct—"a charge which could reasonably be understood as imputing specific criminal or other wrongful acts" — have been found potentially actionable, *Cianci* v. *New Times Publishing Co.* (C.A. 2, 1980), 639 F. 2d 54, 64 (plaintiff alleged to be a rapist); *Lauderback* v. *American Broadcasting Companies, Inc.* (C.A. 8, 1984), 741 F.2d 193 (plaintiff alleged to be under investigation for insurance fraud), the distinction is not always easily made. *Lewis* v. *Time* (C.A. 9, 1983), 710 F.2d 549 (reader might draw inference plaintiff's malpractice actions would lead to disbarment); *Natl. Assn. of Letter Carriers* v. *Austin* (1974), 418 U.S. 264 (no implication of criminal conduct by use of the term "traitor" in defining a "scab"); *Greenbelt*

*Cooperative Publishing Assn., Inc.* v. *Bresler* (1970), 398 U.S. 6 (term "blackmail" not understood in context to be criminal conduct).

Turning to the present circumstances, the crux of appellant's argument is that he was accused of the crime of perjury. The operative language averred to be actionable is listed in appellant's complaint and amended complaint as follows:

"Maple beat the law with the 'big lie.' "

"* * * [A] lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple-Mentor wrestling meet of last Feb. 8.

"A lesson which, sadly, in view of the events of the past year, is well they learned early.

"**It is simply this: If you get in a jam, lie your way out.**

"If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

"The teachers responsible were mainly head Maple wrestling coach, Mike Milkovich and former superintendent of schools H. Donald Scott.

"* * *

"Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

"But they got away with it.

"Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

"I think not."

Based upon this language it should be recognized that there is no express statement that "H. Donald Scott committed perjury." Rather, the clear impact in some nine sentences and a caption is that appellant "lied at the hearing after * * * having given his solemn oath to tell the truth." Based solely on the specific language, as such language is commonly understood, there is little question that were we to consider the statement without further analysis appellant would have stated a valid cause of action. This is, however, only the beginning of our inquiry.

## C

Our second concern is with whether the statement is verifiable. See, *e.g., Bose Corp.* v. *Consumers Union of United States, Inc.* (1984), 466 U.S. 485; *Buckley* v. *Littell* (C.A. 2, 1976), 539 F. 2d 882. The Second Circuit, in *Hotchner* v. *Castillo-Puche* (C.A. 2, 1977), 551 F.2d 910, 913, expanded on this problem in stating, "* * * [I]f an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact." Thus, where the "* * * statement lacks a plausible method of

verification, a reasonable reader will not believe that the statement has specific factual content." *Ollman* v. *Evans, supra,* at 979.

Analysis of the underlying verifiability of Diadiun's article also supports appellant's allegations. Whether or not H. Don Scott did indeed perjure himself is certainly verifiable by a perjury action with evidence adduced from the transcripts and witnesses present at the hearing. Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event.

## D

Our third concern involves an analysis of the larger objective and subjective context of the statement. Objective cautionary terms, or "language of apparency" places a reader on notice that what is being read is the opinion of the writer. Terms such as "in my opinion" or "I think" are highly suggestive of opinion but are not dispositive, particularly in view of the potential for abuse. We are mindful of Judge Friendly's observation that one should not "escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think.' " *Cianci* v. *New Times Publishing Co., supra,* at 64. Accordingly, we are not persuaded that a bright-line rule of labeling a piece of writing "opinion" can be a dispositive method of avoiding judicial scrutiny. Such labeling does, however, strongly militate in favor of the statement as opinion.

Examining the article in its larger context, the first thing one notes is the large caption "TD Says" which would indicate to even the most gullible reader that the article was, in fact, opinion. This position is borne out by the second headline on the continuation of the article which states: ". . . *Diadiun says* Maple told a lie" (emphasis added). Parenthetically, we wonder at the majority's assertion in *Milkovich, supra,* at 299, that "* * * [n]othing in the article effectively precautions the reader that the author's statements are merely his considered opinions."

The language surrounding the averred defamatory remarks is also noteworthy. Although the objective language of apparency is confined to the two headlines noted above, the author takes some care in setting forth the subjective basis behind the article as the impetus to its creation. For example, Diadiun states: "When a person takes on a job in a school, whether it be as a teacher, coach, administrator or even maintenance worker, it is well to remember that his primary job is that of educator." The article goes on to reinforce this concern that those in positions of authority, at any level, also occupy positions of responsibility requiring candor should that authority be called into question. The issue, in context, was not the statement that there was a legal hearing and Milkovich and Scott lied. Rather, based upon Diadiun's having witnessed the original altercation and OHSAA hearing, it was his view that any position represented by Milkovich and Scott less than a full admission of culpability was, in his view, a lie.

A troubling addition to the article, however, was the quote attributed

to Dr. Harold Meyer, commissioner of OHSAA who attended the legal hearing, which stated, " 'I can say that some of the stories told to the judge sounded pretty darned unfamiliar' * * *. 'It certainly sounded different from what they told us.' " There is some question as to whether Meyer ever made such a statement and evidence was adduced by appellant to indicate no such statement was made. This concern, accepting appellant's view of the matter, is mitigated largely because Diadiun clearly did not attend the legal hearing and his article was really based upon the two events he personally witnessed. Diadiun further admits, at the beginning of the article, that the legal hearing involved "* * * whether Maple was denied due process by the OHSAA, the basis of the temporary injunction." Although we cannot necessarily expect the average reader to recognize that a due process hearing might not, and probably would not, involve any questions relating to specific prior conduct beyond the technical OHSAA procedures utilized in the OHSAA hearing, the implicit caveat is still present and is a factor to be considered.

A review of the context of the statements in question demonstrates that Diadiun is not making an attempt to be impartial and no secret is made of his bias. The strongest statement made in the article, "Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, *knows in his heart* that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth" (emphasis added), further indicates that the question of whether or not a lie was actually made is ultimately a subjective determination. While Diadiun's mind is certainly made up, the average reader viewing the words in their internal context would be hard pressed to accept Diadiun's statements as an impartial reporting of perjury.

Our fourth concern is with the broader context of the allegedly defamatory remarks. It has been remarked that "* * * [d]ifferent types of writing have * * * widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion." *Ollman, supra,* at 979, citing *Natl. Assn. of Letter Carriers, supra,* at 286. To evaluate an article's broader context we must examine the type of article and its placement in the newspaper and how those factors would influence the reader's viewpoint on the question of fact or opinion.

It is important to recognize that Diadiun's article appeared on the sports page—a traditional haven for cajoling, invective, and hyperbole. The article itself was under the express byline of "By TED DIADIUN[,] News-Herald Sports Writer." In this broader context we doubt that a reader would assign the same weight to Diadiun's statement as if it had appeared under the byline "Law Correspondent" on page one of the newspaper. This is not to say that the article would be given no weight; on the contrary, there are doubtless individuals whose only contact with newsprint *is* the sports page and a favorite writer's column might well be given weight similar to the Gospel. On balance, however, a reader would

not expect a sports writer on the sports page to be particularly knowledgeable about procedural due process and perjury. It is our belief that "legal conclusions" in such a context would probably be construed as the writer's opinion. Moreover, the allegations that Milkovich or Scott "lied" based upon the erroneous quote by Meyer would appear to fall into the area of law where "* * * we protect some falsehood in order to protect speech that matters," *Gertz, supra,* at 341, particularly where, as in the instant case, the issues involved are of importance to the community and the vehicle for dissemination of the ideas is opinion.

Based upon the totality of circumstances it is our view that Diadiun's article was constitutionally protected opinion both with respect to the federal Constitution and under our state Constitution. We therefore affirm the judgment of the court of appeals.

*Judgment affirmed.*

HOLMES, DOUGLAS and WRIGHT, JJ., concur.

CELEBREZZE, C.J., and SWEENEY, J., separately concur in judgment only, and dissent in part.

C. BROWN, J., concurs in part and dissents in part.

HOLMES, J., concurring. I shall not at any length answer Justice Brown's very energetic exercise of his First Amendment rights other than to say that I, along with Justice Locher and Justice William Brown, dissented in *Milkovich* v. *News-Herald* (1984), 15 Ohio St. 3d 292, in that I felt that the law as pronounced by the majority in such case had no rational legal basis and should have been rejected, and not established as the law of this jurisdiction. Having stated what I felt to be the correct law then, I now embrace those words again as if herein restated. It does no violence to the legal doctrine of *stare decisis* to right that which is clearly wrong. It serves no valid public purpose to allow incorrect opinions to remain in the body of our law. Therefore, I concur in the syllabus and the opinion of the majority herein.

DOUGLAS, J., concurring. I enthusiastically concur in the result reached by the majority, but I wish to express my reasons for such conclusion separately.

Appellant, H. Don Scott, Superintendent of the Maple Heights Public Schools, attended a wrestling match between Maple Heights and Mentor High Schools, on February 8 or 9, 1974 (depending upon which part of the record you believe). Appellee, the News-Herald, published an article on January 8, 1975, written by appellee, Ted Diadiun, which gave an account of a fracas that occurred at the match. The article also told of the subse-

quent sanctioning by the Ohio High School Athletic Association of the Maple Heights team and coaches for their involvement in the disturbance. In addition, the article expressed the writer's view that these sanctions were removed on January 7, 1975 because appellant and another, at a hearing in November 1984, misrepresented the events leading to their imposition.

I

Upon the occasion of this court's first review of the content of the article in question, the court found "* * * that the statements in issue are factual assertions as a matter of law, and are not constitutionally protected as the opinions of the writer." *Milkovich* v. *News-Herald* (1985), 15 Ohio St. 3d 292, 298-299. I emphatically disagree with that finding. Clearly, the sentiments expressed by the writer are opinion, and today the majority has rightfully recharacterized them as such. Accordingly, this opinion enjoys the protection afforded such speech by the First Amendment.

The First Amendment militates the protection of unrestricted and hearty debate on issues of concern to the public, including the protection of what "may well include vehement, caustic, and sometimes unpleasantly sharp attacks * * *." *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, 270. This constitutional protection does not depend for its vitality upon "the truth, popularity, or social utility of the ideas and beliefs which are offered," *N.A.A.C.P.* v. *Button* (1963), 371 U.S. 415, 445; but, rather, "[f]ree speech concerning public affairs" is to be safeguarded because such speech "is more than self-expression; it is the essence of self-government." *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74-75.

Neither factual error nor defamatory content is sufficient to remove the constitutional shield from criticism of official conduct. *New York Times Co., supra,* at 273. Although the use of calculated falsehoods "[is] no essential part of any exposition of ideas * * *," *Chaplinsky* v. *New Hampshire* (1942), 315 U.S. 568, 572, the Supreme Court has recognized that "erroneous statement is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive' * * *." *New York Times Co., supra,* at 271-272, relying in part on *N.A.A.C.P., supra,* at 433. Thus, even if the author's comments in this case contained half-truths and misinformation, such factual error "affords no * * * warrant for repressing speech that would otherwise be free * * *." *New York Times Co., supra,* at 272. Accordingly, except in cases where the author acts with malice, we are obliged to "protect some falsehood in order to protect speech that matters." *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, 341. See, also, *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 732.

The chilling effect that fear of libel suits places on the media is exacerbated in the case of local newspaper publishers who can least afford costly damage awards. It is in these cases, most particularly, that the antithetical

relationship between free expression and the threat of liability is most evident. Accordingly, we would do well to remember that every concession to libel will most assuredly result in compromising freedom of the press. It is with these sentiments that I wholeheartedly concur in the majority's overruling of this court's decision in *Milkovich, supra.* Our decision today goes a long way in providing assurance to local media that they remain free to print the news we all need to know.

## II

A decision favorable to the appellees in this case can rest solely on our determination that the complained-of article is constitutionally protected opinion. However, even if it were not, appellant, as a public official, would be required to prove that the article was published with actual malice in order to prevail. *New York Times Co., supra; Dupler* v. *Mansfield Journal* (1980), 64 Ohio St. 2d 116 [18 O.O.3d 354]. In *New York Times Co.,* the court did not determine "how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of * * * [the actual malice] rule, or otherwise to specify categories of persons who would or would not be included." *Id.* at 283, fn. 23. However, guidance was provided two years later in *Rosenblatt* v. *Baer* (1966), 383 U.S. 75, 85, where the court said:

"It is clear * * * that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."

The conclusion that the appellant meets the *Rosenblatt* criteria by virtue of his position as superintendent of schools is undeniable. There is no doubt that as a superintendent, appellant had responsibility for and control over the administration of the school system. R.C. 3313.47 and 3319.01.[3] In addition, "the public has an interest in the qualifications and performance of" appellant as superintendent, "beyond the general public interest in the qualifications and performance of all government employees * * *." *Rosenblatt, supra,* at 86. Furthermore, appellant's position was "one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* at 87, fn. 13. Public scrutiny of appellant's official conduct, as well as those aspects of his private life which relate to his suitability for his position, was an inconvenience which

---

[3] R.C. 3313.47 states in pertinent part:

"Each city, exempted village, or local board of education shall have the management and control of all of the public schools of whatever name or character in its respective district. * * *"

R.C. 3319.01 states in pertinent part:

"The superintendent of a school district shall be the executive officer for the board. * * *"

he no doubt endured. Finally, the decision of the majority herein regarding appellant's designation as a public official is consistent with the holdings of other courts. See *Palm Beach Newspapers, Inc.* v. *Early* (Fla. App. 1976), 334 So. 2d 50, certiorari denied (1977), 354 So. 2d 351; *Cone* v. *Phipps Broadcasting Stations* (D. Ga. 1979), 5 Media L. Rep. (BNA) 1972; *State* v. *Defley* (La. 1981), 395 So. 2d 759. Accord *Pickerington* v. *Bd. of Edn. of Twp. H.S. Dist. 205* (1967), 36 Ill. 2d 568, 225 N.E. 2d 1.

Assuming *arguendo* that appellant was not a public official, then alternatively, as a public figure, appellant would also be required to prove that the article in this case was published with actual malice. In *Curtis Publishing Co.* v. *Butts* (1967), 388 U.S. 130, the court decided two separate cases, consolidated for review.[4] The first case involved Butts, the athletic director at the University of Georgia, and the second case involved Walker, a retired career army officer who was prominent in the local community. The court held that both men were public figures, indicating two ways in which an individual may become so classified. The court elaborated on those alternatives in *Gertz, supra,* at 351:

"* * * That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."

Although it may be debatable whether appellant was so famous or notorious "that he [became] a public figure for all purposes," it is clear that as superintendent of schools, and thus the person who bears ultimate responsibility for the melee, appellant was undisputably a central figure in this particular controversy. As such, he was clearly a public figure for purposes of this case.

As stated above, a public official or public figure must show actual malice in the publication of a defamatory article in order to prevail. Actual malice is explained as the publication of a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co., supra,* at 280. See, also, *Dupler, supra,* at 118-119. Actual malice must be shown by clear and convincing evidence. *Gertz, supra,* at 342. A showing of reckless conduct requires "sufficient evidence to permit the conclusion that the * * * [publisher] in fact entertained serious doubts as to the truth of his publication." *St. Amant, supra,* at 731. In the recent case of *Bose Corp.* v. *Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 512-513, the court held that to demonstrate actual malice, a

---

[4] *Butts* was decided together with *Associated Press* v. *Walker*, on certiorari to the Court of Civil Appeals of Texas, Second Supreme Judicial District.

public figure must produce evidence that the defendant realized the inaccuracy of the statement at the time of publication.

The record in this case does not contain any proof that appellees had knowledge of the falsity of the publication if, in fact, any part of the article was false. Even though it is apparent from the record that appellee Diadiun did not verify the information he allegedly got from Dr. Meyer, this court stated in *Dupler, supra,* at 119, that "[s]ince reckless disregard is not measured by lack of reasonable belief or of ordinary care, even evidence of negligence in failing to investigate the facts is insufficient to establish actual malice." Accordingly, appellant could not prevail in this defamation action.

## III

Assuming, for the sake of argument, that the appellant in this case was not a public official or public figure and that the statements concerning him were not protected opinion, the question then arises as to what should be the standard applied in cases involving defamation of *private persons*. In *Gertz,* the court retreated from its holding in *Rosenbloom* v. *Metromedia, Inc.* (1971), 403 U.S. 29, that libelous statements about a private person involved in a matter of public concern were privileged. The court held that liability would result where actual malice was established. Indicating, in the opinion of the plurality of that court, that the balance between free speech and private reputation had tipped too far toward free speech, the *Gertz* plurality at 346 concluded that *Rosenbloom* transgressed the states' legitimate interest in compensating injury to the reputation of private individuals. Additionally, the court indicated that private individuals were more deserving of recovery because they had not sought the attention, typically have less opportunity for rebuttal and are, therefore, more vulnerable to defamatory injury. *Gertz, supra,* at 344-345. Consequently, the *Gertz* court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347. However, at the same time, the court also eliminated the common-law doctrine of presumed damages and restricted recovery to compensation for actual injury. *Id.* at 349.

In *Embers Supper Club, Inc.* v. *Scripps-Howard Broadcasting Co.* (1984), 9 Ohio St. 3d 22, 25, this court adopted an ordinary negligence standard for Ohio, stating:

"We are persuaded that the negligence standard of review is appropriate in this area. In cases involving defamation of private persons, where a prima facie showing of defamation is made by the plaintiff, the question which a jury must determine by a *preponderance* of evidence is whether the defendant acted *reasonably* in attempting to discover the truth or falsity or defamatory character of the publication." (Emphasis added.)

It is my belief that the *Embers* decision was ill-considered and that a simple negligence standard is inappropriate. Any standard that punishes certain speech is likely to encourage self-censorship. Thus, the validity of any judicially contrived scheme which leads to such a result requires an identifiable state interest that is an appropriate counterweight for our constitutionally protected interest in unfettered speech. Rules, impervious to constitutional attack when applied to ordinary human behavior (*i.e.,* one must exercise reasonable care in conduct), have to be altered or discarded when used to regulate speech. Although I would not require proof of actual malice, where private persons are involved, some intermediate standard is needed. This standard would require some showing of recklessness on the part of the defendant. Alternatively, a showing of negligence should require a greater quantum of proof.

In *New York Times Co.,* the court held that an act of recklessness was sufficient to prove malice. Thus, a defamatory statement published recklessly could render the publisher liable. My problem with this equation is that malice is intent-based and recklessness is not. Black's Law Dictionary (5 Ed. Rev. 1979) 862, defines "malice" as:

"The intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent. A condition of mind which prompts a person to do a wrongful act willfully, that is, on purpose, to the injury of another, or to do intentionally a wrongful act toward another without justification or excuse. A conscious violation of the law (or prompting of the mind to commit it) which operates to the prejudice of another person. A condition of the mind showing a heart regardless of social duty and fatally bent on mischief. * * *" (Citations deleted.)

"Recklessness" is defined in Black's, *supra,* at 1142-1143, as:

"Rashness; heedlessness; wanton conduct. The state of mind accompanying an act, which either pays no regard to its probably or possibly injurious consequences, or which, though forseeing [*sic*] such consequences, persists in spite of such knowledge. Recklessness is a stronger term than mere or ordinary negligence, and to be reckless, the conduct must be such as to evince disregard of or indifference to consequences, under circumstances involving danger to life or safety of others, although *no harm was intended.* * * *" (Citation deleted, emphasis added.)

Thus, the knowledge and appreciation of a risk, short of substantial certainty, are not the equivalent of intent. A publisher who acts in the belief or consciousness that the publication of an article involves the potential loss of reputation or harm to a private individual may be negligent and if the risk is great, his conduct may be characterized as reckless or wanton, but it should not be classed as an intentional wrong. Accordingly, actual malice should lie only upon a showing of the intentional publication of false statement. Where private individuals are involved, rather than a showing of mere negligence, I would require a showing of recklessness or gross negligence, in derogation of accepted journalistic standards.

This approach was taken in the case of *Chapadeau* v. *Utica Observer-Dispatch, Inc.* (1975), 38 N.Y. 2d 196, 341 N.E. 2d 569. The New York Court of Appeals held at 199 that:

"* * * [A] party defamed may recover * * * [once he establishes] by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

The application of such a standard strikes a more appropriate balance between the First Amendment freedoms guaranteed the press and the individual's right to privacy.

Alternatively, if an ordinary negligence standard is to be applied, the quantum of proof required should be more than a preponderance of evidence. Although the "beyond a reasonable doubt" standard is exclusively applied in criminal cases, it is my opinion that a showing of its functional equivalent should be required in private person libel suits. Operationally, this would require a plaintiff to prove that no reasonable doubt exists as to a publisher's failure to exercise due care under the circumstances.

Regardless of the nature of the harm, states have a legitimate interest in providing their citizens with a remedy. However, the presence of our First Amendment values requires states to use finer, more discriminating instruments to regulate speech in order to protect those values. I would overrule *Embers* in favor of a standard or quantum of proof which accommodates both protection of speech and press and the state's interest in redressing harm to its citizens.

## IV

In conclusion, the First Amendment guarantee of freedom of speech provides us with the right to think as we will and to speak as we think. *Whitney* v. *California* (1927), 274 U.S. 357, 375, Brandeis, J., concurring. When we are tempted, in any way, to move to restrict these precious rights, it is well to remember the historical consequences of the formulation of the First Amendment. When the Constitution was adopted, a number of people strongly opposed it on the basis that the document contained no Bill of Rights to safeguard certain freedoms. See 1 Annals of Congress (1834) 448 *et seq.* One of the greatest fears was that new powers granted to a central government might be used to curtail freedom of religion, press, assembly and speech. In answer to these concerns, James Madison suggested a series of amendments which, if adopted, would assure that these great liberties would remain safe and beyond the power of *any* branch of government to abridge. It is my judgment that in preserving the freedoms of speech and press, guaranteed by the First Amendment, we must accord protection to the expression of ideas we abhor or sooner or later such protection of expression will be denied to the ideas we cherish.

The First Amendment gives a special protection to the press from the chilling effect of defamation litigation. This is a protection we must preserve at any and all cost and, accordingly, as far as the majority's decision today reinforces this protection, I heartily concur.

WRIGHT, J., concurring. I concur in Justice Locher's decision. He provides the bench and bar with sensible guidelines as to when a writing should be treated as an expression of opinion, and a meaningful definition of who qualifies as a public figure.

Almost two hundred years after the passage of the First Amendment guarantee of freedom of speech, some folks are still debating the wisdom of that idea. That, of course, is what this case is all about. All of us should be free to speak, read or hear views of whatever may be of interest. It is this particular right that distinguishes the rights of our citizenry from those of people living under fascism or communism.

As the law of libel has developed in this country, courts have been forced to distinguish between statements of fact and opinion. The common law allowed libel defendants a qualified privilege of fair comment on matters of public interest when the statements were based upon disclosed or publicly available facts and made honestly and without malice. See, *e.g.,* Prosser, Law of Torts (4 Ed. 1971) 819-820. In *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, the United States Supreme Court raised statements of opinion to the level of constitutionally protected free speech. Justice Locher quotes with approval the basic premise of *Gertz* that: "* * * Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. * * *" *Id.* at 339-340. I believe the framers of our Constitution felt that an informed electorate was the genius of our system. Thus, in my view, free speech is the brightest star in our constitutional constellation.

Sharp criticism of a governmental official produces a far greater public good in a democracy than does artificial respect fostered by suppression of such opinion. "Progress generally begins in skepticism about accepted truths. The danger that citizens will think wrongly is serious, but less dangerous than atrophy from not thinking at all. Thought control is a copyright of totalitarianism, and we have no claim to it. It is not the function of our government to keep the citizen from falling into error; it is the function of the citizen to keep the government from falling into error." *American Communications Assn.* v. *Douds* (1950), 339 U.S. 382, 444. If this court sanctions in any form interference with the ideas of the opinion-maker, our claim to be guardians of a free press is hollow.

As Judge Harry T. Edwards said from the bench during oral argument in *Ollman* v. *Evans* (C.A. D.C. 1984), 750 F. 2d 970, "When you read the [libel] cases, they are a mess." Sanford, Libel and Privacy (1985) 107. It is practically impossible to reconcile the case law in this area and Justice

Locher has wisely eschewed such a course. Instead, we have made it clear that opinions stated in a column, cartoon or an editorial are constitutionally protected free speech. Thus, rather than rely on a legacy of confusion, we have adopted the fundamental premise that the media has the right as well as the duty to inform the public through editorial comment, however harsh, on any matter of genuine public interest.

I agree with Justice Locher's rejection of the standard found in the Restatement of the Law 2d, Torts (1977) 170-172, Section 566, Comment *a,* which provides that "mixed" statements of fact and opinion are libelous if the underlying facts are not stated and if the opinion can reasonably be taken to imply the existence of defamatory facts. The Restatement approach focuses on possible reader reaction, which is a difficult standard for evaluation. Also, the Restatement approach requires courts to engage in the nearly impossible task of forming standards for intelligently analyzing the difference between a "pure" statement of opinion as opposed to a "mixed" opinion that implies defamatory facts.[5] Justice Locher has wisely held that any statement of opinion, whether pure or mixed, will not form the basis for an action in tort.

I would go a step further than my colleagues, however, and grant the media the right to attain absolute protection by identifying an article as opinion. A column without such a label which is outside the editorial opinion portion of the paper would be treated as fact and be afforded only the limited protection articulated in *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254. A like test would apply to radio or television programming. I would reject any approach that requires the trial court to determine whether or not the statements are susceptible to proof of truth or falsity. If the context of the statement is in the nature of editorial comment it should be treated as privileged free speech.

This "bright-line" rule would eliminate the uncertainty of characterizing statements as opinion or fact. It would provide predictability and fairness in an area of the law which is presently a legal morass. Such a rule would be helpful to the media and would serve the public interest as it lends itself to ready compliance yet protects vital free speech interests in the expression of opinion.

The dissenters' remarks concerning the doctrine of *stare decisis*

---

[5] As an illustration, note the learned remarks contained in Notes, Fair Comment (1949), 62 Harv. L. Rev. 1207, 1213: "The statement in question should be regarded as one of fact if a substantial number of readers would understand it as intended to convey ideas the asserted validity of which is independent of the belief of the person making the statement. If a substantial number of readers would understand the statement to rest solely on the opinions of the person making the statement, the statement should be regarded as comment and should come within the privilege if the matter is one of public interest." I pity the poor trial judge who attempts to wrestle with such an ambiguous definition! The reader-oriented approach obviously provides little or no assistance to the bar or bench as to how one may gauge the reaction of readers, what sampling is necessary, or which readers to consult.

deserve comment. First of all, I rejoice in their charismatic conversion. Second, it is clear that the demise of *Milkovich* v. *News-Herald* (1984), 15 Ohio St. 3d 292, presents no revolutionary changes in the law of libel. To the contrary, a dearth of decisional law supports *Milkovich* and much case law militates a contrary conclusion. Third, as Justice Locher points out, when a past decision of this court is *plainly* mistaken and destructive of a constitutional imperative such as freedom of speech, we should not hesitate to confess our error. As Justice Locher demonstrated, in *Milkovich* no test was offered with regard to distinguishing fact from opinion and no analysis was given to support the court's conclusion. Thus, the "rationale" in *Milkovich* was fatally flawed.

I believe in the doctrine of *stare decisis* and I will continue to support this doctrine, regardless of my personal predilections as to public policy in some particular area of the law. Precision and consistency are values of the highest order in judicial decision-making. Populist jurisprudence only creates unpredictability in the law. While understanding that the common law is not immutable, we should strive to follow past experience and precedent. Justice Locher's opinion does no violence to these concepts.

Accordingly, I concur.

CELEBREZZE, C.J., concurring in judgment only, and dissenting in part. I wholeheartedly concur in the majority's conclusion that appellant is a public official. Similarly, I support the majority's determination that appellant failed to establish the requisite actual malice in the publication of the article at issue. With the resolution of these two issues and this court's affirmance of the grant of summary judgment to appellee, the News-Herald is insulated from liability. But the majority plunges on. It needlessly overrules our prior decision in *Milkovich* v. *News-Herald* (1984), 15 Ohio St. 3d 292, certiorari denied (1985), ___ U.S. ___, 88 L. Ed. 2d 305, in which this court held that the statements in this same article were, as a matter of law, factual assertions.[6] The clarity of today's majority opinion gives way to the amorphous "totality of the circumstances" test which is used to complete the Jekyll and Hyde transformation of this newspaper article from fact to opinion.[7] This test is not only unworkable, it is applied by the majority in self-contradictory fashion to reach an untenable result.

---

[6] If our decision in *Milkovich, supra,* was so "plainly" in "error," one wonders how the United States Supreme Court could have allowed the decision to stand.

[7] The totality of the circumstances test adopted by the majority was enunciated in *Ollman* v. *Evans* (C.A. D.C. 1984), 750 F. 2d 970, 979, in which the court stated, in pertinent part:

"We believe * * * that courts should analyze the totality of the circumstances in which the statements are made to decide whether they merit the absolute First Amendment protection enjoyed by opinion. * * * [W]e will evaluate four factors in assessing whether the average reader would view the statement as fact or, conversely, opinion. * * *

"First, we will analyze the common usage and meaning of the specific language of the

The article culminates with the statement that appellant lied under oath while testifying at a court hearing, *i.e.*, that appellant committed the crime of perjury. The majority admits that the truth or falsity of such a statement can be verified. (I must, however, question the majority's implication that appellant should somehow cause a criminal prosecution against himself to do so.)

In its tortuous route to the preordained result that this denigrating statement is a constitutionally protected expression of opinion, the majority next searches for qualifying "language of apparency." While first stating that terms such as "I think" or "in my opinion" are *not* dispositive, the majority then ignores its own logic by concluding that readers would assume this entire article was opinion merely because it was captioned "TD Says" and "Diadiun says." This conclusion escapes me. Rather, I would have thought, as Justice Brown points out, that the purpose of a caption is to identify the writer.

The majority finally proceeds to the determination that readers would not construe the statement in this news article as fact because it appeared on the sports page.

Apparently, the majority feels that serious journalism and factual reporting are not likely to be found in the sports pages of a newspaper. I must disagree. Sports journalists are no less likely than other journalists to be informed about procedural due process or perjury, as recent lengthy accounts of legal proceedings involving drug abuse by professional athletes demonstrate. Sports writers are as accountable for the accuracy of their reporting as are their brother news journalists. The assumption that most readers view sports columnists as colorful and opinionated but innately lacking in credibility is, in my view, inaccurate, condescending, and cannot serve as the basis for the ridiculous conclusion that the statement in issue was "probably" opinion because it appeared on the sports page. Would the majority be forced to conclude that the statement in this article was "probably" fact had it appeared on the front page? If in doubt on the accuracy of an article, should editors run the news story in the sports or comic section to be on the safe side?

I am convinced that this court was right the first time, in *Milkovich, supra.* Although the column undeniably contained the writer's opinion in certain respects, it also contained the specific factual assertion that appellant lied while under oath. This statement was verifiable. Its location on the sports page was not a reliable indication that this statement was to be taken as opinion. Finally, there was nothing in this article which would have alerted the reader that this statement was intended to be the writer's opinion. To the contrary, Diadiun bolstered the assertion in part with a

---

challenged statement itself. * * * Second, we will consider the statement's verifiability * * *. Third, * * * we will consider the full context of the statement * * *. Finally, we will consider the broader context or setting in which the statement appears. * * *"

quote from Dr. Harold Meyer to the effect that appellant had told some "pretty darned unfamiliar" stories to the judge. In essence, Diadiun was telling his readers this was not just his biased view, but rather the objective conclusion of an impartial observer at the hearing. From this followed Diadiun's direct and factual assertion that, based on Dr. Meyer's observations, appellant had lied under oath. Try as it may, the majority cannot drown this fact in a sea of opinion.[8]

There is an additional pitfall in today's conclusion that this alleged defamatory statement is not actionable. The majority acknowledges that the "clear impact" of this statement, as "commonly understood," is that appellant committed the crime of perjury. Such criminal accusations, even if expressed as opinion, are not entitled to absolute constitutional protection.

In *Rinaldi* v. *Holt, Rinehart & Winston, Inc.* (1977), 42 N.Y. 2d 369, 397 N.Y.Supp. 2d 943, 366 N.E. 2d 1299, certiorari denied (1977), 434 U.S. 969, a state court judge brought a libel action against the publishers of a book which described him as being corrupt. The New York Court of Appeals held at 382 that this statement was not protected as opinion.

"Accusations of criminal activity, even in the form of opinion, are not constitutionally protected. * * * While inquiry into motivation is within the scope of absolute privilege, outright charges of illegal conduct, if false, are protected solely by the actual malice test. As noted by the Supreme Court of California, there is a critical distinction between opinions which attribute improper motives to a public officer and accusations, in whatever form, that an individual has committed a crime or is personally dishonest. No First Amendment protection enfolds false charges of criminal behavior." Accord *Cianci* v. *New Times Publishing Co.* (C.A. 2, 1980), 639 F. 2d 54, 64; *Gregory* v. *McDonnell Douglas Corp.* (1976), 17 Cal. 3d 596, 604, 131 Cal. Rptr. 641, 552 P. 2d 425.

I am unable to see the qualitative difference between a charge that a public official is corrupt and the instant accusation that a public official committed the crime of perjury.

Thus, not only does the majority strain to label as opinion the factual assertion that appellant lied under oath, it also fails to recognize that such a statement, even if opinion, is not entitled to unqualified constitutional protection where criminal conduct is alleged. Therefore, the appellees in the instant cause are entitled to the protection of the rule in *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254 (plaintiff who is a public official

---

[8] Under the elastic test adopted by today's majority, the only thing which *is* clear is that a statement's characterization as fact or opinion is truly in the eye of the individual judge. Rather than providing "predictability," the cryptic totality of the circumstances test leaves those in search of stability with as much guidance as that provided by the newspaper's daily horoscope.

must prove with convincing clarity that defendant acted with actual malice), but no more.

Accordingly, since I agree that appellant is a public official and has not established actual malice in the publication of this article, I concur in the judgment. I respectfully dissent from my brothers' unfortunate conclusion that the alleged defamatory statement in this article is an opinion entitled to absolute constitutional protection.

SWEENEY, J., concurring in judgment only, and dissenting in part. While I concur in the majority's decision with respect to appellant's status as a public official, and that appellant failed to prove that the article in issue was written with actual malice, I must dissent from the majority's nullification of our very recent opinion in *Milkovich* v. *News-Herald* (1984), 15 Ohio St. 3d 292. In addition to the well-reasoned points raised by Chief Justice Celebrezze and Justice Clifford Brown, I wish to make several of my own observations.

The majority opinion chides the *Milkovich* majority for not resting its decision on any particular rule, and then sets forth a nebulous "totality of circumstances" test that pretends to establish an analytical framework for resolving controversies dealing with the fact-opinion dichotomy. The central problem with the test provided by the majority is that it tumbles into the very pitfalls that it claims should be avoided.

In exploring the nuances of the majority's test, we find that with respect to the first factor, the majority readily concedes that the language used in the instant article, standing alone, "would have stated a valid cause of action." Thus, this factor does not fortify the majority's final conclusion in any way.

The second factor employed by the majority, *i.e.,* whether the allegedly libelous statements made are verifiable, is inherently suspect, especially in light of the facts of the cause *sub judice.* The majority's flawed analysis under this factor would require appellant to press perjury charges against himself in order to gain an acquittal, and then, if successful, commence the instant libel action. The absurdity inherent in this factor is further revealed by the fact that even if appellant were to be acquitted of perjury, it would not necessarily make appellees more likely to be liable for defamation, since each action would entail differing burdens of persuasion.

Turning to the third factor enunciated by the majority, we find confusion and inconsistency throughout its reasoning. The majority chastises this court's opinion in *Milkovich, supra,* for being conclusory, and then turns around and engages in the type of conclusory analysis that it condemns! The majority spends much time discussing the relevancy of labeling or "language of apparency," but fails to judiciously scrutinize the content of the article in issue. Although the majority is correct in stating that the author of the article was undeniably biased, it fails to carefully consider the ramifications of the message the author is conveying.

In my view, the instant article sets forth both assertions of fact and

the opinions of its author. In essence, the author states as fact that he attended the wrestling match and the OHSAA hearing, and that Dr. Meyer was present at the due process hearing. After quoting Meyer concerning Milkovich's and Scott's testimony (a quote which Meyer denies making), the author asserts that anyone who attended the wrestling meet knows in his heart that Milkovich and Scott lied under oath at the due process hearing. Such, in my mind, is clearly an assertion of fact.

While the majority is "mindful" of Judge Friendly's observation that, "[i]t would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think,' " *Cianci* v. *New Times Publishing Co.* (C.A. 2, 1980), 639 F. 2d 54, 64, the majority fails to effectively and seriously reconcile this ideal in relation to the article in issue. In this vein, I believe that this court should reaffirm the principles articulated in *Milkovich, supra,* and apply the rationale supplied by the court in *Cianci, supra,* along with the decisions rendered in *Rinaldi* v. *Holt, Rinehart & Winston, Inc.* (1977), 42 N.Y. 2d 369, 397 N.Y. Supp. 2d 943, 366 N.E. 2d 1299, certiorari denied (1977), 434 U.S. 969; and *Gregory* v. *McDonnell Douglas Corp.* (1976), 17 Cal. 3d 596, 131 Cal. Rptr. 641, 552 P. 2d 425.

Under the majority's fourth factor, a veritable *per se* rule is created whereby anything defamatory that appears in the sports pages is automatically non-actionable. As with the other factors used in this new "test," the "context" factor is full of self-contradictions and conclusions based on perfunctory and hollow analysis. Also, the majority scoffs at the notion of applying "a bright-line rule" to classify articles as being assertions of fact or opinion, and then curiously engages in the bright-line rule-making that it scorned in its third factor, by holding, *inter alia,* that "TD Says" means TD's opinion, and essentially that anything appearing in the sports pages is, by definition, opinion. Particularly disturbing is the majority's flippant remarks about sports writers and the people who read the sports pages. Such a tasteless and unwarranted attack is both haughty and snobbish.

In sum, the majority's new "test" is in reality no test at all, because its components can be juxtaposed to forge any interpretation that the user of the "test" desires. I believe that the majority's "test" is patently arbitrary, and too unreliable to be given this court's imprimatur.

Equally flawed, in my view, is the concurring opinion that attempts to solve the fact-opinion distinction by suggesting that the print media label an article as an "editorial" or "opinion," in order to signal readers that the article that follows is constitutionally protected. While such an approach would arguably add precision to the reconciliation of fact-opinion issues, it would necessarily be deficient since it is the content as well as the context of an article that assists the ultimate determination of whether a particular newspaper article presents a potentially redressable action in libel. As applied to the instant cause, even if I were to accept the

majority's premise that "TD Says" indicates that the article represents only the views of the author, I would still be unpersuaded that the accusations of perjury made by the writer should be unconditionally protected as the majority preaches. Again, I sincerely believe that the majority has seriously erred by refusing to place any legitimate weight on the cogent rationale adopted by this court in *Milkovich,* and set forth in *Cianci, supra,* and other like precedents.

With respect to the discussions of *stare decisis,* I find it somewhat amusing that some of my fellow justices have been forced to explain why this doctrine should not be applied in this cause. One of the concurring opinions states that *stare decisis* has no application *vis-a-vis* the *Milkovich* case because "a dearth of decisional law supports *Milkovich* and much case law militates a contrary conclusion." Even if this assertion were correct, which it is not, such a rationale is wholly inadequate. Simply because there is a "dearth of decisional law" supporting a holding does not make such holding ill-conceived or untenable; otherwise, under the concurring opinion's reasoning, *Brown* v. *Board of Education* (1954), 347 U.S. 483, should have been overruled shortly after its decision, since "much case law militates a contrary conclusion" in line with the prior ruling rendered in *Plessy* v. *Ferguson* (1896), 163 U.S. 537.

All of the foregoing notwithstanding, I am pleased that the flood of separate concurring opinions in this cause exalting the primacy of the First Amendment finally pays due reverence to the United States Constitution and the freedoms it is supposed to guarantee to our citizens. Given the wholesale destruction of the Fourth Amendment by this court in recent cases, perhaps this new-found enlightened reasoning employed today will now spread to other constitutional controversies.

In any event, it would be more satisfactory if some of the concurring majority would restrain the pompous discourse concerning the importance of freedom of the press, and dispense with the platitudes. A more thorough approach to constitutional analysis would lead them to the inevitable discovery that the framers of the Ohio Constitution were especially cognizant of the potential for abuse that could occur in the establishment of a free press, and that is why this guarantee was somewhat tempered with a modicum of guidelines. Section 11, Article I of the Ohio Constitution states in plain and concise language: "Every citizen may freely speak, write, and publish his sentiments on all subjects, *being responsible for the abuse of the right;* and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *" (Emphasis added.)

Thus, several of the majority are careless when stating, in effect, that the right to a free press should never be encumbered with any checks whatsoever. Certainly the framers of the state Constitution did not share this view when they crafted the above-stated constitutional provision. Under Ohio law, responsibility for the abuse of the right to freely speak and publish obviously and necessarily includes the limitations established in the law of defamation.

Overall, several of the majority seem all too willing to forget the numerous reports we hear concerning individuals, some with great notoriety and others who are not so well known, who are libeled by certain sensationalistic gossip publications typically found at most grocery store checkouts. I do not really intend to single out those particular publications, because many are scrupulous about the limits inherent in the right to a free press, and are aware of the harm that can be wrought by a libelous attack or accusation. However, I do intend to drive home a point to those in the majority who seem to intimate that freedom of the press necessarily means total immunity from suit, regardless of the venom or falsity contained in a particular news item.

There is no one sitting on this court who does not appreciate and cherish our constitutional guarantee of a free press; however, such a guarantee carries with it a duty owed to the public to be responsible and truthful, as well as bold and provocative. When this duty is seriously breached, the law provides injured persons with a mode of redress, which is why the law of libel was designed in the first place.

In closing, I wish to emphasize the abundant respect that I hold for the members of the journalistic profession. These individuals perform a vital function in society by disseminating topical information and commentary to the populace. Unfortunately, as is the case in all professions, a very small minority sometimes exceeds the limits of propriety by inflicting irreparable harm to the reputation of others. I am sure that the overwhelming majority of journalists would agree that some type of redress is necessary in appropriate cases, in order to uphold the integrity and ideals of the journalistic profession. In such cases, we rely on the courts to insure that the important interests underlying the First Amendment and Section 11, Article I of the Ohio Constitution are weighed in combination with Section 16, Article I of the Ohio Constitution, which sets forth the state's interest in compensating injury to the reputation of persons in our society. *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323. Although such a task is, at times, extremely difficult, we must always strive for the attainment of equal justice for all under the law, in order to maintain those freedoms guaranteed in both the federal and state Constitutions. While a free press is essential to the maintenance of a truly democratic society, the right to a free press also guarantees implicitly, and in the case of the Ohio Constitution explicitly, the rights of the individuals who lack the means of counter-argument to rebut defamatory statements which cause injury to their reputations.

Based on all the considerations heretofore discussed, I join the majority's judgment in this case, but I dissent from its unnecessary, capricious and unwarranted disposal of *Milkovich, supra.*

CLIFFORD F. BROWN, J., concurring in part and dissenting in part. I concur in the majority's conclusion that under the reasoning of *Rosenblatt* v. *Baer* (1966), 383 U.S. 75, appellant, H. Don Scott, as superintendent of

the local public schools, is a public official for purposes of the law of defamation and that, as such, Scott failed to prove actual malice as required by *Dupler* v. *Mansfield Journal* (1980), 64 Ohio St. 2d 116 [18 O.O.3d 354]. Therefore, I agree that the appellees were entitled to summary judgment in the instant case.

However, I am compelled to dissent from the majority's convenient reconsideration and reversal of this court's recent holding that the very article we considered today constitutes an assertion of fact. See *Milkovich* v. *News-Herald* (1984), 15 Ohio St. 3d 292. In my view, *Milkovich*'s characterization of the language at issue in the instant case was sound law and should not be disturbed. Further, given the majority's resolution of the other issues, its treatment of *Milkovich* is both overreaching and gratuitous.[9]

As the majority correctly recites:

"It is implicit in the doctrine of *stare decisis* that some principle be established that the public may rely upon with the understanding it will not lightly be overturned. The underlying rationale for *stare decisis* is the importance of constancy and consistency in law. In the absence of consistency and constancy the value of law in society is diminished. * * *"

But having recited the underpinnings of *stare decisis*, the majority rejects the doctrine in this case, based upon its distorted and incomprehensible view that our opinion in *Milkovich* failed to set forth a workable "rule." Clearly, the majority's reading of *Milkovich* would discount the paragraph wherein, having recited the options selected by other courts, we stated: "While we decline to establish a *per se* rule in determining what constitutes a protected opinion or a potentially redressable assertion of fact [as, I note, today's majority also purports to decline], our review of the instant cause leads us to conclude that the lower courts erred in holding that the statements in issue were nothing more than the writer's 'heartfelt' opinion. We find that the statements in issue are factual assertions as a matter of law, and are not constitutionally protected as the opinions of the writer." *Id.* at 298-299. On what basis did the *Milkovich* majority reach that conclusion? Our two-prong "test" immediately followed: "*Nothing in the article effectively precautions the reader that the author's statements are merely his considered opinions. The plain import of the author's assertions is that Milkovich, inter alia, committed the crime of perjury in a court of law.*" (Emphasis added.) *Id.* at 299. If the majority today is so ready to castigate the *Milkovich* test, certainly its solution is no improvement. Indeed, I maintain that even under the "rule" purportedly adopted

---

[9] One concurring opinion is advisory, dealing with pure *obiter dicta* which is designed to curry further adulation by the news media — which it most assuredly will — by intimating that *Embers Supper Club, Inc.* v. *Scripps-Howard Broadcasting Co.* (1984), 9 Ohio St. 3d 22, which was not argued below, should be overruled. The *Embers* case and the issues therein contained are not relevant to a determination of the present *Scott* case.

today by the "revolving door advocates" of *stare decisis*,[10] the statements considered in *Milkovich* and reconsidered today constitute assertions of fact and, as such, are not entitled to First Amendment protection as the opinions of the writer.

In applying its newly adopted "totality of circumstances test," even the majority concedes that the first factor, "the specific language used," creates "the clear impact of some nine sentences and a caption" that "appellant 'lied at the hearing after * * * having given his solemn oath to tell the truth.' " Thus, the language used states a factual assertion that appellant committed perjury. The majority so concedes, and the *Milkovich* majority so recognized.[11] (The only difference today is that the majority no longer seems to find this factor to be important.)

---

[10] I use the word "purportedly," because despite the majority's contorted application of its new and improved four-factor test, any reader of today's majority opinion can readily see the real rule adopted by the majority: in a libel case, *the newspaper always wins*.

[11] In determining whether a statement is fact or opinion, the majority advances a purported "test" involving "at least four factors," and in support thereof cites a host of legal precedents from federal jurisdictions. A review of these cited cases reveals that none of them provides even the remotest foundation for this "test."

In support of the first factor, "specific language used," the majority cites *Cianci* v. *New Times Pub. Co.* (C.A. 2, 1980), 639 F. 2d 54, which holds that an article stating that a mayor had been accused of rape was not protected as a "statement of opinion," and does not support the defendants' thesis herein that the Diadiun statement was opinion, not fact. *Cianci, supra,* supports the holding in *Milkovich* that the Diadiun news article was a statement of fact and not an opinion. *Lauderback* v. *American Broadcasting Companies, Inc.* (C.A. 8, 1984), 741 F. 2d 193, is inapplicable because it dealt with statements in a TV broadcast by defendant that an insurance agent was dealing unscrupulously with elderly citizens, and unlike the Diadiun statement here, did not involve an allegation of criminal conduct by plaintiff. The United States Court of Appeals held that representations that an insurance agent was guilty of unethical behavior constitute opinion protected by the First Amendment. Likewise, *Lewis* v. *Time, Inc.* (C.A. 9, 1983), 710 F. 2d 549, is inapplicable because the defendant did not assert a criminal act by plaintiff. Instead, the gist of the United States Court of Appeals' holding is that the "[a]lleged inference arising from [the] magazine article that the named attorney was a dishonest 'shady practitioner' was a constitutionally protected opinion, because the article set forth the facts underlying the opinion that the attorney was a 'shady practitioner,' i.e., state court judgments against the attorney for fraud and malpractice." *Id.* at paragraph nine of the headnotes.

*Natl. Assn. of Letter Carriers* v. *Austin* (1974), 418 U.S. 264, is also totally irrelevant. The case did not involve a statement by defendant of criminal acts by plaintiff. The court held, and properly so, that the use of the epithet "scab" in the union newsletter could not be the basis of a state libel judgment. The same is true of *Greenbelt Cooperative Publishing Assn.* v. *Bresler* (1970), 398 U.S. 6, which held that the word "blackmail" in the circumstances of the case was not slander when spoken at the city council meeting nor libel when reported in the newspaper articles which were accurate, it being clear no reader could have thought plaintiff was being charged with the commission of a criminal offense. The Diadiun article in the present case is not even a remote relative of the *Greenbelt* case.

Neither does the cited case of *Ollman* v. *Evans* (C.A. D.C. 1984), 750 F. 2d 970, have any relevancy. It held that statements set forth in a newspaper column questioning the nomination of the plaintiff, an avowed Marxist, to a university post, were constitutionally protected

The majority previous thereto stated that the determination of whether an averred defamatory statement constitutes opinion or fact is a question of law for the court, and not for a jury. (See *Milkovich, supra,* at 298, wherein we held *as a matter of law* that the statement was a factual assertion.) It then wends its tortuous way through a four-factor "totality of circumstances test," alternately labeling the so-called factors as concerns. This is all by way of leading to the majority's conclusion that the Diadiun statement that plaintiff lied under oath (committed perjury) was constitutionally protected opinion and not a statement of fact as a *matter of law* both under the federal Constitution and the Ohio Constitution. This sounds exactly like Big Brother in Orwell's Nineteen Eighty-Four, where, by convoluted reasoning, contradictory terms or concepts are considered to be synonymous.[12]

The majority also concedes that the *second* factor, "whether the statement is verifiable," operates in appellant's favor on the facts of this case, because "[u]nlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." The majority's determination of these first two factors in favor of plaintiff should conclusively support a finding that the article is a statement of fact accusing plaintiff of the crime of perjury, and is therefore defamatory *per se.* However, in my view, the majority's abortive attempt to clear up the law of defamation with a workable test breaks down as it proceeds further and attempts to apply the *third* and *fourth* factors.

When applying the *third* factor, the "general context of the statement," the majority gives lip service to the "potential for abuse" which would occur if terms such as "in my opinion" or "I think" were held conclusively to distinguish expressions of opinion from assertions of fact, but then proceeds to find phrases which are indistinguishable from those terms determinative in this case. In my (apparently "most gullible") view, the caption "TD Says" is merely a "catchy" means of identifying the writer, and does not cut distinctively one way or the other as a signal that what follows will be opinion or fact. Similarly, the second headline,

---

expressions of opinion, rather than assertions of fact, and were not actionable in a defamation action. The newspaper article did not ascribe any criminal conduct to plaintiff as did the Diadiun article herein.

Nowhere do the above-cited cases, singly or collectively, suggest anything resembling a four-factor test as set forth by the majority today. The result-oriented majority is bent on overruling *Milkovich.* Any irrelevant precedent was grabbed to lend superficial credence to their analysis and to frustrate easy analysis. Ohio now is unique in having unintelligible gibberish as a standard for actionable defamation of a private citizen. No other jurisdiction has experimented in this frenzied manner with such a standardless standard.

[12] Big Brother, in Orwell's Nineteen Eighty-Four, says the following:
"War is Peace
"Freedom is Slavery
"Ignorance is Strength"

". . .Diadiun says Maple told a lie" merely identifies the author of the factual assertion which follows.

The point is that the majority's new "test" is, in practice, so malleable and spongy as to permit any interpretation anyone wishes. It will enable any judge or reviewing court to label any clearly libelous statement of *fact* as a statement of *opinion* and thereby for all practical purposes create absolute immunity for every congenital liar who publicly utters or writes slanderous or libelous statements. Most likely, given a close reading, the article in question combines assertions of fact with expressions of opinion in the hope that the facts asserted will bolster the impact of the opinions. Nonetheless, that combination should not detract from the majority's specific finding that the language used imparts "the clear impact" that appellant committed the crime of perjury, and that the article reinforces that "impact" with a quotation attributed to a named, apparently reputable source, a fact which the majority characterizes as merely "troubling." Given the lack of clear guidance that the majority's "test" provides, this is an ideal case to apply the doctrine of *stare decisis*.

Finally, I look to the majority's analysis of the *fourth* factor: "the broader context in which the statement appeared." The majority's suggestion that sports writers are inherently less believable than others (for example, a "Law Correspondent") ought to belie any perceived legitimate legal analysis which follows. Indeed, this *"fourth* factor" really adds nothing to the other factors discussed *supra,* and submerges further into the morass of a Serbonian bog those seeking to distinguish a statement of fact from one of opinion in any future case. The clear message of the majority in the second to last paragraph of its opinion is that in order to avoid a defamation suit, one should put the controversial statement on the sports page, which is another way of saying that any fact appearing on the sports page is not to be believed because it is mere constitutionally protected opinion. All of the so-called four factors, concerns and/or tests amount to no more than a geyser spouting judicial steam, fog, and mist.

I note with interest Justice Holmes' particular judicial hypocrisy[13] as to the doctrine of *stare decisis* which, by his presence in today's majority, amounts to a double-standard of justice. When displeased by the majority's holding, Justice Holmes has often pontificated as to the sanctity of *stare decisis* and irreverence by its disregard. See *Saunders* v. *Zoning*

---

[13] I am particularly intrigued with Justice Holmes' concurrence, wherein he opines that "[i]t does no violence to the legal doctrine of *stare decisis* to right that which is clearly wrong. It serves no valid purpose to allow incorrect opinions to remain in the body of our law." If his position were not so transparently hypocritical on this case, I would welcome his conversion to my own oft-expressed views on the doctrine of *stare decisis*. However, I feel certain that his convenient retreat from his historical reliance on *stare decisis* will be limited to cases such as this one, in which he finds himself in a majority which is bound and determined to uphold the unabashed trammeling of the rights of individuals by big businesses such as the newspaper herein.

*Dept.* (1981), 66 Ohio St. 2d 259 [20 O.O.3d 244], in which Justice Holmes, dissenting, at 265, stated: "The flexibility effected by this decision, which, in effect, overruled syllabus law as pronounced by this court only nine months ago, * * * transforms the law of *stare decisis* into that which assumed a stability not unlike a revolving door. It would seem that the law of this state will be now governed by what might be the personnel of the court, or the panel hearing and writing upon a case, or both, at any given point in time." I note further that Justice Locher concurred in Justice Holmes' dissenting view in that case. And in *Shroades* v. *Rental Homes* (1981), 68 Ohio St. 2d 20 [22 O.O.3d 152], Justice Holmes, dissenting at 29, stated: "Again we find * * * that the law of this state, as most recently pronounced by this court, moves rapidly through the revolving door of change, further eroding any vestige of *stare decisis* that might remain as a legal principle to be followed by the bench and bar of Ohio." Further, at 31, Justice Holmes continued: "It would appear that 15 months is quite enough for the law of this state as pronounced by a majority of this court to be settled and followed by our legal community. * * * [T]he validity of *stare decisis* as a controlling principle in settling the law of this state is only valid under the condition of a non-changing pattern of the membership of the court—hardly a satisfactory condition of stability of the law upon which lower courts and practitioners in Ohio may reasonably rely.

"Believing in the principle of *stare decisis* where the same matter had recently been fairly debated and considered by this court, and where no additional relevant factors are presented which would alter our prior announcement on the subject, I would so adhere to our prior determination * * * ."14

In the instant appeal, Justice Holmes now joins a bare majority of four which cavalierly overrules *Milkovich, supra,* decided less than two years ago and (coincidentally?) on the eve of this court's most recent change of personnel by the election of two new justices who took office in January 1985. These two new justices have joined Justices Holmes and Locher in smashing to smithereens their sacred doctrine of *stare decisis.* Justice Holmes has given nary the slightest indication for his apparent recant of reverence for the doctrine of *stare decisis.* Apparently, *stare decisis* is meaningful, in any case, only when Justice Holmes is part of a minority strongly opposed to the majority's visionary, progressive holdings. Justice Locher must share the same view. Such treatment truly renders *stare decisis* a doctrine of convenience in which the "revolving door" turns at the writer's pleasure.

In light of the transparently weak analysis the majority has employed to overrule and repudiate this court's recent holding as to precisely the

---

14 See, also, *Baker* v. *McKnight* (1983), 4 Ohio St. 3d 125 (Holmes, J., dissenting, at 131); *Ady* v. *West American Ins. Co.* (1982), 69 Ohio St. 2d 593 [23 O.O.3d 495] (Holmes, J., dissenting, at 603).

same newspaper article at issue in *Milkovich,* Justice Holmes' own words in his dissent in *Wilfong* v. *Batdorf* (1983), 6 Ohio St. 3d 100, 109, again most appropriately describe the majority's action: "I strongly conclude that the law as most recently announced * * * should be followed by the court in this case. To do otherwise again completely demolishes any remaining semblance of the doctrine of *stare decisis* in this state. The only change that has taken place which would conceivably alter our position as announced in * * * [here, *Milkovich,* decided December 31, 1984] has been an intervening change of personnel on the court—precisely the type of changed circumstance that the doctrine of *stare decisis* has been relied upon to maintain the stability of the case law of this jurisdiction. What confidence may attorneys, judges and litigants have in the stability of the decisional law of this court? This query is self-answering."

The views expressed by the majority as well as by all three dissenting justices reveal that there is unanimity of all seven justices that the summary judgment in favor of defendants should be affirmed simply and solely by holding that plaintiff was a public official for defamation purposes, requiring proof of actual malice by defendants which, as a matter of law, was not established. We need go no further in reaching a unanimous judgment in favor of defendants.

In order to curry favor with the media at large in an election year, favor which is particularly beneficial to one of its majority, a majority of four rushes hell-bent to overrule *Milkovich.*[15] The so-called champions of *stare decisis* are anything but that when the prior decision is at odds with their own preconceived jurisprudential agenda. It takes more judicial courage and backbone to express what is right and just, confining the decision to the short, single issue necessary to complete the resolution of this case, than to curry popularity by appealing to the prejudices or predilections of the news media or any special group by writing a legal opus containing pseudo-erudition on an issue which in any event was wholly unnecessary for a complete determination of this case.

All of the foregoing is apparent from the majority's vapid, meaningless, so-called four-factor test to determine if a defamatory statement is a statement of fact or opinion. Where this issue exists in any libel trial in future cases involving the press as a defendant, the trial judge might as well simply direct a verdict for the defendant, or even better, routinely grant summary judgment motions made by the defense, because, given the result of the case at bar, it is difficult to imagine what otherwise libelous statements of fact will remain actionable once they have been printed in a newspaper.

---

[15] Curiously, the majority cites to the dissent of two justices of the United States Supreme Court to the petition for certiorari in *Milkovich* and, *sub silentio,* intimates that this dissent is the law of the case, namely, that *Milkovich* was a public figure. However, the majority opinion conveniently ignores the fact that seven justices of the United States Supreme Court did not share the views about *Milkovich* which were articulated in that dissent.

If the trial judge, perhaps erroneously, concludes that there is a jury issue and tries to frame an understandable jury instruction from the verbal orgy of nonsensical jargon which cascades from the majority's discussion of the spurious four-factor test so as to distinguish fact from opinion, his instruction will likewise probably be deemed nonsense by any reviewing court when measured by the standardless *Scott* case. In that event the appellate court should fashion a rule for jury instruction instead of the vacuous nonsense in the present opinion representing the views of a majority of four.

The standardless four-factor test for distinguishing fact from opinion, as applied here in *Scott,* makes every statement of fact a statement of opinion in every case and therefore not actionable. This is a deprivation of every libeled plaintiff's rights under both the Ohio Constitution and the United States Constitution[16] which provide as follows:

Section 16, Article I, of the Ohio Constitution:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or *reputation,* shall have remedy by due course of law, and shall have justice administered without denial or delay." (Emphasis added.)

Section I of the Fourteenth Amendment to the United States Constitution:

"* * * [N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

If the majority desires to be absolutist (all statements of fact are opinions) with respect to the First Amendment freedom of the press, it should say so, as did the late Justice Hugo Black, instead of foisting upon the public several confusing theories, standards and analyses of legal justification and defense, all of which will obfuscate the law in this area.

---

[16] The majority opinion says that "[m]isstatements and falsehoods are inevitable in any democratic scheme," and in the same paragraph indicates that such falsehoods are not redressable because of the " 'chilling' effect" such redress would have on "the expression of unpopular statements." That is a strange convolution. Unpopular statements will be and should be protected until they become factual, legally defamatory statements.

# Maple beat the law with the 'big lie'

**By TED DIADIUN**
**News-Herald Sports Writer**

Yesterday in the Franklin County Common Pleas Court, Judge Paul Martin overturned an Ohio High School Athletic Assn. decision to suspend the Maple Heights wrestling team from this year's state tournament.

It's not final yet — the judge granted Maple only a temporary injunction against the ruling — but unless the judge acts much more quickly than he did in this decision (he has been deliberating since a Nov. 8 hearing) the temporary injunction will allow Maple to compete in the tournament and make any further discussion meaningless.

But there is something much more important involved here than whether Maple was denied

## TD Says

due process by the OHSAA, the basis of the temporary injunction.

When a person takes on a job in a school, whether it be as a teacher, coach, administrator or even maintenance worker, it is well to remember that his primary job is that of educator.

There is scarcely a person concerned with school who doesn't leave his mark in some way on the young people who pass his way — many are the lessons taken away from school by students which weren't learned from a lesson plan or out of a book. They come from personal experiences with and observations of their superiors and peers, from watching actions and reactions.

Such a lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple-Mentor wrestling meet of last Feb. 8.

**Please turn to page 39**

APPENDIX

# ... Diadiun says

# Maple told a lie

A lesson which, sadly, in view of the events of the past year, is well they learned early.

It is simply this: If you get in a jam, lie your way out.

If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

The teachers responsible were mainly head Maple wrestling coach Mike Milkovich and former superintendent of schools H. Donald Scott.

Last winter they were faced with a difficult situation. Milkovich's ranting from the side of the mat and egging the crowd on against the meet official and the opposing team backfired during a meet with Greater Cleveland Conference rival Metor, and resulted in first the Maple Heights team, then many of the partisan crowd attacking the Mentor squad in a brawl which sent four Mentor wrestlers to the hospital.

Naturally, when Mentor protested to the governing body of high school sports, the OHSAA, the two men were called on the carpet to account for the incident.

But they declined to walk into the hearing and face up to their responsibilities, as one would hope a coach of Milkovich's accomplishments and reputation would do, and one would certainly expect from a man with the responsible poisition of superintendant of schools.

Instead they chose to come to the hearing and misrepresent the things that happened to the OHSAA Board of Control, attempting not only to convince the board of their own innocence, but, incredibly, shift the blame of the affair to Mentor.

I was among the 2,000-plus witnesses of the meet at which the trouble broke out, and I also attended the hearing before the OHSAA, so I was in a unique position of being the only non-involved party to observe both the meet itself and the Milkovich-Scott version presented to the board.

Any resemblance between the two occurances is purely coincidental.

To anyone who was at the meet, it need only be said that the Maple coach's wild gestures during the events leading up to the brawl were passed off by the two as "shrugs," and that Milkovich claimed he was "Powerless to control the crowd" before the melee.

Fortunately, it seemed at the time, the Milkovich-Scott version of the incident presented to the board of control had enough contradictions and obvious untruths so that the six board members were able to see through it.

Probably as much in distasteful reaction to the chicanery of the two officials as in displeasure over the actual incident, the board then voted to suspend Maple from this year's tournament and to put Maple Heights, and both Milkovich and his son, Mike Jr. (the Maple Jaycee coach), on two-year probation.

But unfortunately, by the time the hearing before Judge Martin rolled around, Milkovich and Scott apparently had their version of the incident polished and reconstructed, and the judge apparently believed them.

"I can say that some of the stories told to the judge sounded pretty darned unfamiliar," said Dr. Harold Meyer, commissioner of the OHSAA, who attended the hearing. "It certainly sounded different from what they told us."

Nevertheless, the judge bought their story, and ruled in their favor.

Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

But they got away with it.

Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

I think not.