**VERICH**

v.

**VINDICATOR PRINTING COMPANY et al.**

2002-Ohio-7482.]

Court of Common Pleas of Ohio,
Trumbull County.

No. 00–CV–1131.

Decided March 11, 2002.

Charles E. Ohlin and Samuel Bluedorn, for plaintiff.

David L. Marburger, for defendant.

---

W. Wyatt McKay, Judge.

{¶ 1} This matter is before this court upon defendants' motion to dismiss. The court has reviewed the motion, plaintiff's memoranda contra thereto, and the applicable law.

{¶ 2} Plaintiff Christopher F. Verich was appointed as a state assemblyman to replace his brother Michael Verich. Defendant Bertram de Souza is a columnist for The Vindicator newspaper, which is published daily by defendant The Vindicator Printing Company.

{¶ 3} Plaintiff Christopher Verich has asserted a libel claim based on an article that appeared in a column written by defendant Bertram de Souza and published in The Vindicator newspaper. Specifically, Verich complains about a statement in which defendant de Souza opines that plaintiff had "zero credentials" for his appointment to his brother's seat in the General Assembly.

{¶ 4} On March 12, 2000, de Souza wrote a column entitled "Praise for the losers? Hardly." The column commented upon the results of the Democratic

primaries in Mahoning and Trumbull Counties. Among de Souza's comments in the March 12, 2000 article, he mentions plaintiff's unsuccessful bid for the democratic nomination and expressed the opinion that plaintiff had "zero credentials" for that position when he was appointed to it when his brother Michael Verich resigned. On June 26, 2000, plaintiff filed this action alleging libel based upon that comment.

{¶ 5} In ruling on a motion pursuant to Civ.R. 12(B)(6), a court must, as a matter of law, accept all of the allegations in the complaint as true. *Perez v. Cleveland* (1993), 66 Ohio St.3d 397, 613 N.E.2d 199. To grant such a motion, it must appear beyond a reasonable doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981. However, the determination of whether allegedly defamatory language is opinion or fact is a question of law to be decided by the court. *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699.

{¶ 6} Defendants have alleged that the statement regarding plaintiff's credentials is constitutionally protected opinion. Plaintiffs, however, allege that defendants' remarks were libelous *per se.*

{¶ 7} Ohio holds that written matter is libelous per se if, on its face, it reflects upon a person's character in a manner that will cause him to be ridiculed, hated, or held in contempt, or in a manner that will injure him in his trade or profession. When a writing is not ambiguous, the question of whether it is libelous per se is for the court to decide. *Becker v. Toulmin* (1956), 165 Ohio St. 549, 553, 60 O.O. 502, 138 N.E.2d 391.

{¶ 8} Under Ohio law, for a statement to be defamatory, it must be a statement of fact and not of opinion. Section 11, Article I of the Ohio Constitution provides that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

{¶ 9} Whether allegedly defamatory language is opinion or fact is a question of law for the court to decide. A "totality of the circumstances" test is used to determine whether a statement is fact or opinion. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182. This is a fluid test that calls for the court to consider the specific language used, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared.

{¶ 10} Attached to plaintiff's complaint and incorporated by reference is a copy of Bertram de Souza's column. The article appeared in the "Viewpoint" section

of the March 12, 2000 edition of The Vindicator. In this article entitled "Praise for the losers? Hardly," de Souza recites his rendition of the outcome of the results for some of the candidates in both Mahoning and Trumbull Counties. Particularly at issue in this case, defendant has this to say about the plaintiff:

"The Verich brothers, who have made slopping at the public trough an art form in Trumbull County, state Rep. Chris Verich lost the Democratic nomination to former Warren Mayor Daniel Sferra. But the real loser was Michael Verich, who held the House seat until he resigned to take an appointment to a state commission when faced with being term limited out. Michael Verich, along with the party hierarchy, anointed Chris, who had zero credentials. Now, Michael must find Chris a job." See plaintiff's complaint.

{¶ 11} The issue before this court is whether the language under question is categorized as fact or opinion.

{¶ 12} To begin with, the court must look at the context in which defendant de Souza's comments appear. There can be no question that the general context in which the columnist's statement were made is opinion. The column appears on the "Viewpoint" page of the newspaper. The word "viewpoint" conveys the message that the reader of this column will be exposed to the personal opinions of the writer, de Souza. This kind of column is distinguished from a news story, which should contain only statements of fact or quotes of others but not the opinion of the writer of the story. Additionally, de Souza's column appeared at the end of a political campaign, which provided the subject for the column.

{¶ 13} To determine the legal issue, the court must consider the full context of the statements in question. Is this particular column characterized as statements of objective facts or exaggeration? The general theme of defendant's column is sarcastic in nature, more typical of persuasive speech than factual reporting. Once again, before a reader even begins to read de Souza's column, he or she must read the all-in-caps word "VIEWPOINT," which to ordinary readers would imply that this is the author's opinion of what they are about to read.

{¶ 14} The court must also determine whether the ordinary reader would view de Souza's words to be language that normally would convey factual information or hype and opinion and whether the language has an ascertainable meaning or is ambiguous. While this court believes that defendant's language has a precise meaning and would be understood by the ordinary reader for just what it is, his attempt to persuade public opinion of Verich's credentials, de Souza's characterization of Verich as having "zero credentials" can hardly be construed as an objective statement. Even when construing all inferences in favor of Verich, this

single phrase is insufficient to overcome the conclusion that an ordinary reader would believe that defendant's statement was his own opinion.

{¶ 15} Another question is whether de Souza implies in his article that he has firsthand knowledge that substantiates the opinions he asserts. Where the "statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." *Scott v. News–Herald,* 25 Ohio St.3d at 251–252, 25 OBR 302, 496 N.E.2d 699. In the case at bar, the reference to Verich's credentials is clearly not an articulation of a verifiable event. The alleged defamatory statement is simply not amenable to verification. There is no objective standard to prove or disprove its contents. The language used by de Souza represents a point of view that is obviously subjective.

{¶ 16} In considering the totality of the circumstances this court also has to analyze the broader context in which the statement appears. At first blush, the court cannot help but comment that "zero" does not necessarily always have a negative connotation. Going back in history, there was an actor back in the 50s and 60s by the name of Zero Mostel. He was not only an accomplished actor but he was also a musician and a writer. He acted on Broadway and had roles in "A Funny Thing Happened On The Way To The Forum" and "The Producers," among others. This court has no way of knowing whether or not he changed his name, but either he or his parents thought enough about "zero" to make it his moniker.

{¶ 17} Additionally, during World War II, the Japanese developed and flew a fighter plane that became known as "Japanese Zero." At the time of its development, it was known for its maneuverability and speed, and it gave Pappy Boyington and his fighter group all they could handle in the Pacific Theater of the war while the United States was flying the Corsair. The P–51 Mustang was later introduced into the war and was very superior to any plane developed at that time. But there is no question that the Zero commanded respect from those fighter pilots who had to deal with its formidability in combat.

{¶ 18} There is also a candy bar by the name of "Zero." While this particular judge has not had the occasion of trying this culinary delight, my wife extols its merits and claims that it is delicious.

{¶ 19} And what about the tragic events that occurred on 9–11. After the Word Trade Center was demolished, the entire area became known as "Ground Zero." It is now looked upon as a consecrated site that contains the remains of the brave Americans that gave their life on that fateful day. The very name "Ground Zero" is revered by all Americans and thousands flock to the site to give homage and pay their respects.

{¶ 20} As well as "zero" having positive connotations, "zero credentials" also does not necessarily carry only negative meaning, particularly when it comes to employment. When the very author of this opinion stood election for judge his opponents claimed that he lacked credentials. And there is currently a joke that goes like this:

"Q: What do they call a lawyer with zero credentials?

"A: A judge."

{¶ 21} Indeed, the very nature of the business of judging presupposes that one side will win and one side will lose. Since it is only human to err, this judge has no doubt been involved with opinions that were mistakes and other opinions that were correct but not received with the utmost respect from the losing side. As a matter of fact, this judge has been made privy to conversations wherein a disgruntled litigant referred to my nose being stuck in my posterior, or words to that effect. And I have heard that a certain lawyer on one occasion referred to my academic ability as being compared to fecal matter for brains, or words to that effect. Perhaps one could construe that and similar comments to mean that this judge has "zero credentials." The only credentials that are required to be a judge are that one be a lawyer for six years. Since we are all aware of the public opinion of lawyers, enough is said.

{¶ 22} But I would be remiss not to mention the fact that it is highly unlikely that the very scribe I defend in this opinion had any credentials when he became a "political columnist." I doubt that he had any political experience or that he had any experience writing a column. He was most likely a beat writer that filled a slot. But there is no question that his job is much like that of a judge in that the targets of his column are a bit unhappy with his final product. One can only imagine that public officials may comment from time to time that he does not know his hindmost anatomy from a hole in the ground, or words to that effect, or that he is so unintelligent that he could not pour urine from a boot if the instructions were on the heel, or words to that effect. Likewise, it is doubtful that these same officials compliment him for his accuracy or his political savvy. Perhaps one could also construe these and other comments to the effect that de Souza has "zero credentials."

{¶ 23} But having "zero credentials" is not all that bad. In the case at bar, the legislature in its infinite wisdom does not require any credentials at all to hold the office of legislator. Virtually anyone of the proper age is eligible to become a lawmaker. The experience from our valley indicates that a number of our local officeholders have various backgrounds completely unassociated with politics. We have elected or appointed a barber, lawyers, a brewer, a farmer, a steelworker, a railroad worker, a businessman, a housewife, and a schoolteacher, just to name a few.

{¶ 24} Moreover, this is the way it should be. After all, most of the jobs in our economy are similarly situated in the sense of qualifications. How many bankers had banking experience prior to employment? How many firemen put out fires before they were hired? How many steelworkers knew anything about steel? And the list goes on and on and on. One's ability to achieve excellence in his or her chosen profession or line of work is directly related to one's ability to learn the job by on-the-job training in most cases.

{¶ 25} Also, our economy is, to a large extent, dependent on people being able to relocate and train for new jobs if they or their employer desires a change or if an economic downturn requires same. Who can question the wisdom of our forefathers in requiring zero credentials so that our legislature would be representative of a cross-section of our population?

{¶ 26} In point of fact, "zero credentials" are words of art in that one basically starts with education and then builds a resume hoping that one will be hired or elected, as the case may be, based on what are perceived as basic qualifications. Whether the employer or the electorate agree with them is always subject to the whim of the personnel department or the voters.

{¶ 27} This court has been in a position to see many professional and political resumes that supposedly pose credentials for a particular position. Many of them, quite frankly, are padded with cow manure, or words to that effect. On the other hand, I have also seen extremely brief resumes. The actual performance of the employee or officeholder after being hired or appointed or elected, more often than not, is directly linked to the common sense, intellectual ability, and general work ethic that the person possesses rather than the alleged qualifications or credentials.

{¶ 28} Finally, there is an enormous question as to actual damages in this case if the court were to proceed to trial. While this subject is not in issue in this motion to dismiss on the pleadings, the court, in passing, would simply indicate that it has been its experience that most people do not read the newspaper and those that do are not enamored with its accuracy.

{¶ 29} Since this court has interviewed thousands of jurors in the jury-selection process, about 40 percent of those polled read the local newspaper, and most of those direct their attention to the obituaries or sports or comics and only skim the news, while very few read the editorial section of the newspaper. And when asked whether they believe that the news is accurate in its presentation, virtually all say "no." With this backdrop, it looks like the damages would be zero.

{¶ 30} In review then, it appears that what we have here is a complaint for defamation filed by Christopher Verich wherein the judge hearing the case arguably has zero credentials, and he is making an opinion about a political

columnist who arguably has zero credentials, who wrote an opinion about a legislator's having zero credentials for a job that has zero credentials, all of which caused zero damages. It seems that this can be reduced to a mathematical equation: $0+0+0+0+0 = ?$ Since the author of this opinion lacks the credentials to answer this simple equation, he decided to go home and ask his six-year-old son, Robert, if he could come up with the answer. Robert is enrolled in kindergarten and was quick to answer, "That's easy, Daddy. The answer is zero." Ahhh! My sentiments exactly. The case is worth zero.

{¶ 31} Finally, since Christopher Verich is a brewer by trade, it seems that there is one more question to ponder: Which career would bring the most satisfaction—public figure, political columnist, or making beer? Hmm! I think I'll ask Robert if he knows the answer when I go home tonight.

{¶ 32} In conformance with the opinion herein, defendants' motion to dismiss this action is hereby granted. Plaintiff is to bear the costs of this action.

{¶ 33} IT IS SO ORDERED.

Cause dismissed.