[Cite as *Fronk v. Univ. of Toledo*, 2010-Ohio-4307.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


SUZETTE FRONK

Plaintiff

v.

THE UNIVERSITY OF TOLEDO

Defendant
Case No. 2007-08473

Judge Joseph T. Clark

DECISION


{¶ 1}  Plaintiff brought this action against defendant, University of Toledo (UT), alleging wrongful termination in violation of a public policy and invasion of privacy-false light.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.[1]

{¶ 2}  In her complaint, plaintiff alleges that she was wrongfully discharged from her position with defendant in violation of the public policy exception to the employment-at-will doctrine.  Plaintiff also alleges a claim of invasion of privacy in that defendant's employee published false statements about her, which she alleges were highly offensive and caused her to be viewed in a false light.

{¶ 3}  Defendant maintains that plaintiff was not terminated, that she continues to be employed by defendant, and that to the extent that she seeks whistleblower protection, this court lacks jurisdiction over such claim.  In addition, defendant asserts

that the disparaging comments were contained in a private communication, that they merely expressed the opinion of the author, that the author was not responsible for publicizing the comments, and that the substance of the comments does not rise to such level as to be considered highly offensive.

{¶ 4} Plaintiff testified that she has been employed by defendant since 1999 and that she serves in an at-will capacity.[2]  Initially, she was hired as the interim business manager for the College of Engineering and she was responsible for payroll, grants, requisitions, and human resources.  In May 2001, she was placed on special assignment and asked to perform an audit of the athletics department (department).  Plaintiff found that there was a deficit in the budget and that various sections within the department were not using the university's financial records system.  In October 2001, plaintiff was hired by the interim director of the department to be the Assistant Director of Business.  As an assistant to the athletic director, plaintiff managed the accounts payable and receivable, human resources, and other financial concerns within the department.  In December 2001, Mike O'Brien was hired to be the Athletic Director.

{¶ 5} According to plaintiff, she reported to O'Brien that certain irregular financial procedures were occurring that needed to be properly documented.  For example, the marketing section of the department operated a barter system whereby businesses provided discounted or free food and drink in exchange for free advertising or tickets to university sporting events.  Plaintiff informed O'Brien that such trade-offs should be documented with receipts, to include the names of the persons accepting the benefit and the date of the corresponding advertising or ticket exchange.  Plaintiff identified and reported other problems that she discovered with reference to monies generated from the sale of food and goods during coach-run camps wherein the cash was not being deposited into university accounts and receipts were missing or incomplete.  In addition, one coach had charged dry cleaning bills to the university which plaintiff considered to be a violation of university policy.  Plaintiff sought to have

---

[1]At the close of plaintiff's case, defendant made an oral motion to dismiss plaintiff's claims pursuant to Civ.R. 41(B)(2), which the court took under advisement.

[2]In an at-will employment relationship, either an employer or an employee may legally terminate the employment relationship at any time and for any reason. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 103, *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 2002-Ohio-3994.

those funds repaid as such action was not an approved use of the university credit cards.

{¶ 6} Plaintiff also notified O'Brien that she found instances where cash had been collected at track meets and was not properly accounted for nor was it deposited into a university account. Plaintiff voiced opposition to other departmental purchases including commemorative rings and pendants which were issued to the winning team members, but also to non-players and non-staff as well. Plaintiff complained that this was a violation of UT rules and policy.

{¶ 7} Plaintiff also became concerned about the department's budget when she learned that members of the football staff traveled to Germany at university expense. Upon inquiring about the trip, plaintiff was told that the purpose of the venture was for recruitment. According to plaintiff, the department could not authorize payment for the trip because it had occurred during a blackout period when recruiting was not allowed. The trip was subsequently labeled as a goodwill trip; however, plaintiff discovered that the trip had not been authorized by the university's president. Due in part to plaintiff's persistence, the university was eventually reimbursed from private funds through the athletic foundation.

{¶ 8} Plaintiff also warned O'Brien about the ramifications to the department regarding a trip to the Virgin Islands that occurred in the fall of 2005 via chartered aircraft at a cost to the university in excess of $60,000. Plaintiff notified O'Brien that nonessential personnel who traveled, including wives, girlfriends, and children of department staff, would either be billed for the value of their seat on the plane or that a W-2 form would be generated to reflect the benefit received by the respective staff members. Plaintiff recalled that in response to her input on the matter, reimbursement was made to UT from private athletic foundation accounts and others paid for the non-staff flights from personal funds.

{¶ 9} On May 15, 2007, plaintiff received a letter notifying her that her position had been eliminated as part of the reorganization due to the merger of UT with UT's medical college. Plaintiff testified that she was told that she no longer needed to report to work but that she would continue to receive her salary through August 13, 2007, and full benefits until August 31, 2007. Plaintiff testified that she then turned in her UT

identification card, parking pass, keys, and P-card.[3] Plaintiff stated that she hired an attorney and that her attorney contacted the local newspaper, the Toledo Blade (the Blade), to bring public attention to the fact that plaintiff may have been retaliated against for questioning the financial practices that had been occurring in the department. Plaintiff also contacted a prominent donor to the athletic program, Chuck Sullivan, and informed him that an article would be forthcoming that put the program in a negative light. Plaintiff later learned that Sullivan notified O'Brien that an article was forthcoming.

{¶ 10} Plaintiff acknowledged that she met with reporters from the Blade and discussed with them why she believed that O'Brien terminated her position in retaliation for plaintiff's having questioned certain financial irregularities in the department. The Blade published a series of articles in June and July 2007. According to plaintiff, at least one of the articles referenced comments made by O'Brien in an e-mail that he had sent to Jack Zerbey, an employee of the Blade who worked in the business section and who handled the barter arrangements between the department and the Blade. O'Brien stated in the e-mail "I eliminated her position a month ago and she is the ultimate disgruntled employee." (Plaintiff's Exhibit 16.) O'Brien also stated "I had to eliminate her role as she was a tremendous blow to our morale; among other things." (Plaintiff's Exhibit 16.)

{¶ 11} Plaintiff contends that O'Brien's comments were false and that they cast her in a false light before members of the public. Plaintiff opined that she is not a disgruntled employee and that inasmuch as she had been told that her position was eliminated due to the merger, O'Brien's second statement was also false. It is undisputed that the president of UT, Dr. Jacobs, rescinded the elimination of plaintiff's position and she returned to the campus on July 7, 2007. Plaintiff testified that she remained assigned to the department but that she had no further interactions with O'Brien. After a few weeks, plaintiff was relocated to the budget office. At the time of trial, plaintiff remained employed by UT.

{¶ 12} Defendant argues that insofar as plaintiff claims she suffered an adverse employment action in retaliation for reporting potential violations either of state and

---

[3]A P-card, also known as a purchasing card, is a type of credit card that the university assigns to various employees who are authorized to use the card for business expenses. The expenses placed on the card are paid by the university.

federal statutes, or of UT policies, plaintiff seeks whistleblower protection. R.C. 124.341, often referred to as "the state employee whistleblower statute," applies to classified and unclassified state employees.

{¶ 13} R.C.124.341 states as follows:

{¶ 14} "(A) If an employee in the classified or unclassified civil service becomes aware in the course of employment of a violation of state or federal statutes, rules, or regulations or the misuse of public resources, and the employee's supervisor or appointing authority has authority to correct the violation or misuse, the employee may file a written report identifying the violation or misuse with the supervisor or appointing authority. In addition to or instead of filing a written report with the supervisor or appointing authority, the employee may file a written report with the office of internal auditing created under section 126.45 of the Revised Code.

{¶ 15} "(B) Except as otherwise provided in division (C) of this section, no officer or employee in the classified or unclassified civil service shall take any disciplinary action against an employee in the classified or unclassified civil service for making any report authorized by division (A) of this section, including, without limitation, doing any of the following:

{¶ 16} "(1) Removing or suspending the employee from employment;

{¶ 17} "(2) Withholding from the employee salary increases or employee benefits to which the employee is otherwise entitled;

{¶ 18} "(3) Transferring or reassigning the employee;

{¶ 19} "(4) Denying the employee promotion that otherwise would have been received;

{¶ 20} "(5) Reducing the employee in pay or position.

{¶ 21} "(C) An employee in the classified or unclassified civil service shall make a reasonable effort to determine the accuracy of any information reported under division (A) of this section. The employee is subject to disciplinary action, including suspension or removal, as determined by the employee's appointing authority, for purposely, knowingly, or recklessly reporting false information under division (A) of this section.

{¶ 22} "(D) If an appointing authority takes any disciplinary or retaliatory action against a classified or unclassified employee as a result of the employee's having filed a

report under division (A) of this section, *the employee's sole and exclusive remedy*, notwithstanding any other provision of law, is to file an appeal with the state personnel board of review within thirty days after receiving actual notice of the appointing authority's action." (Emphasis added.)

{¶ 23} Thus, any such claims brought pursuant to R.C.124.341 are heard and determined by the State Personnel Board of Review. R.C. 4113.52 also grants protection to state employees. That section states, in pertinent part:

{¶ 24} "(A) (1) (a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and *the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution,* the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

{¶ 25} "* * *

{¶ 26} "(3) If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

{¶ 27} "(B) Except as otherwise provided in division (C) of this section, no employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(1) or (2) of this section, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of

any information reported under either such division. No employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(3) of this section if the employee made a reasonable and good faith effort to determine the accuracy of any information so reported, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under that division. For purposes of this division, disciplinary or retaliatory action by the employer includes, without limitation, doing any of the following:

{¶ 28} "(1)  Removing or suspending the employee from employment;

{¶ 29} "(2)  Withholding from the employee salary increases or employee benefits to which the employee is otherwise entitled;

{¶ 30} "(3)  Transferring or reassigning the employee;

{¶ 31} "(4)  Denying the employee a promotion that otherwise would have been received;

{¶ 32} "(5)  Reducing the employee in pay or position.

{¶ 33} "* * *

{¶ 34} "(D)  If an employer takes any disciplinary or retaliatory action against an employee as a result of the employee's having filed a report under division (A) of this section, *the employee may bring a civil action for appropriate injunctive relief or for the remedies set forth in division (E) of this section, or both, within one hundred eighty days after the date the disciplinary or retaliatory action was taken, in a court of common pleas* in accordance with the Rules of Civil Procedure.  A civil action under this division is not available to an employee as a remedy for any disciplinary or retaliatory action taken by an appointing authority against the employee as a result of the employee's having filed a report under division (A) of section 124.341 [124.34.1] of the Revised Code." (Emphasis added.)

{¶ 35} Thus, state employees in Ohio are afforded two separate and distinct statutory remedies in the event that they experience retaliation for reporting violations as described above.  To the extent that plaintiff attempts to assert a whistleblower retaliation claim under either R.C. 4113.52 or 124.341, this court is without jurisdiction to determine such causes of action.

{¶ 36} Plaintiff maintains that she is not asserting a claim under R.C. 124.341 or 4113.52. Rather, plaintiff contends that her claim is based upon a common-law exception to the employment-at-will doctrine. A public policy exception to the employment-at-will doctrine was first recognized by the Supreme Court of Ohio in *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228. In *Greeley* the court held that "public policy warrants an exception to the employment-at-will doctrine when an employee is *discharged or disciplined* for a reason which is prohibited by statute." Id. at 234. (Emphasis added.)

{¶ 37} In *Painter v. Graley*, 70 Ohio St.3d 377, 1994-Ohio-334, the public policy exception was expanded, and claims for wrongful discharge were allowed for employment terminations that violated public policy as expressed in sources other than the Ohio Revised Code. Under *Painter*, supra, the public policy exception to the employment-at-will doctrine "is not limited to public policy expressed by the General Assembly in the form of statutory enactments" but "may [also] be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law." Id. at 384.

{¶ 38} The issue whether any termination of employment violates public policy must be analyzed according to a four-prong test which balances the justification for the termination against the effect it will have on the public policy. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 1997-Ohio-219. Specifically, reviewing courts must determine whether: 1) a clear public policy was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); 2) the firing would jeopardize that public policy (the jeopardy element); 3) the dismissal was motivated by conduct related to the public policy (the causation element); and 4) the employer had a legitimate business justification for the termination (the overriding justification element). Id. at 151. The clarity and jeopardy elements are questions of law, while the causation and overriding-justification elements are questions of fact. Id. Here, plaintiff argues that the public policy of promoting and protecting taxpayer monies used to support a public university has been jeopardized as a result of UT's decision to terminate her employment.

{¶ 39} According to her complaint, plaintiff was trying to remedy possible violations of federal tax laws and Ohio laws, as well as possible violations of NCAA rules and regulations. Plaintiff alleges that she was terminated for questioning the financial irregularities of the department, for requiring reimbursement to the department for certain unapproved expenses, and for issuing W-2 forms where certain perks or benefits received by departmental employees constituted income. Even assuming that a clear public policy existed under the facts of this case, and assuming that terminating plaintiff's position would have jeopardized that public policy, the court concludes that plaintiff has failed to prove by a preponderance of the evidence that she was, in fact, discharged. The May 15, 2007 letter states that "your employment is being terminated effective at the close of business August 13, 2007. * * * You will continue to be paid your full salary through the date above as well as be covered by any health care benefits for which you currently have coverage through August 31, 2007. During this time period, you will receive work direction from your supervisor as to your ongoing assignments and to discuss transition issues." (Plaintiff's Exhibit 15.) Although plaintiff was informed that her position was being eliminated, the testimony and evidence at trial established that the decision to eliminate her position was rescinded and that she returned to the campus well before the date of her scheduled termination. In addition, plaintiff was paid her full salary and remained eligible for all of her health care benefits. Thus, the court concludes that plaintiff was not discharged.

{¶ 40} The court notes that a public policy claim may be brought by employees who have been either "discharged or disciplined." *Greeley,* supra, at paragraph one of the syllabus. Nonetheless, the court finds that plaintiff has failed to prove that the actions taken by UT amount to discipline. The court finds that the types of discipline contemplated as prohibited by *Greeley* equate to adverse employment actions which include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 727. "A change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Kocsis v. Multi-Care Mgt., Inc.* (C.A.6, 1996), 97 F.3d 876, 886." *Mittman v. Bahls*, 148

Ohio App.3d 109, 116, 2002-Ohio-2808. "Although adverse employment actions are not limited to economic losses, 'not everything that makes an employee unhappy is an actionable adverse action.' *Smart v. Ball State Univ.* (C.A.7, 1996), 89 F.3d 437, 441. Employment actions that result only in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action. *Peterson,* supra, at 727." *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 781, 2003-Ohio-5340, ¶38. See also *Doneworth v. Blue Chip 2000 Commercial Cleaning, Inc.* (July 10, 1998), Hamilton App. No. C-970379, (holding that an employer's allegedly retaliatory determination to reduce the plaintiff's hours and support staff did not constitute "discipline" under Greeley and therefore did not constitute an actionable claim for violation of public policy).

{¶ 41} In essence then, plaintiff complains that she was mistreated or harassed in violation of public policy. "'Neither *Greeley* nor its progeny have recognized a tort for harassment in violation of public policy.' *Bell v. Cuyahoga Community College* (1998), 129 Ohio App.3d 461, 465, 717 N.E.2d 1189. In *Hillman v. Safeco Ins. Company of America* (N.D.Ohio 2002), 190 F. Supp.2d 1029, the plaintiff's inability to prove that he was either actually or constructively discharged defeated his claim for wrongful discharge as the result of alleged age discrimination. As observed by the court in *Evans v. Toys R Us-Ohio, Inc.* (S.D.Ohio 1999), 32 F. Supp. 2d 974, '[a] review of relevant case law shows that the public policy tort has not been extended to claims for failure to promote or retaliation.' Id. at 990, citing *Bell.* In *Bools v. General Electric Co.* (S.D.Ohio 1999), 70 F. Supp. 2d 829, 832, the court stated: 'Our research indicates that Ohio appellate courts seem hesitant about expanding the exception [to] the doctrine of employment-at-will beyond claims for wrongful termination.' * * * This court is not inclined to create or recognize a cause of action for harassment in violation of public policy based upon these facts." *Strausbaugh v. Ohio Dept. of Transp.*, 150 Ohio App.3d 438, 449-450, 2002-Ohio-6627.

{¶ 42} As to plaintiff's second cause of action, the Supreme Court of Ohio has recently recognized the tort of false-light invasion of privacy and adopted Restatement of the Law 2d, Torts, Section 652E. *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, ¶61. The court held that "one who gives publicity to a matter concerning

another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Id.

{¶ 43} Plaintiff's claim is based upon two comments that were contained in an e-mail authored by O'Brien and eventually published by the Blade. The e-mail was sent on June 7, 2007, from O'Brien to Joe Zerbey, and reads in pertinent part as follows:

{¶ 44} "Joe, also I wanted to bring something to your attention that may or may not occur. I had a large donor call me yesterday that indicated that a previous employee of the [department] and her [attorney] have gone to the Blade. I eliminated her position a month ago and she is the ultimate disgruntled employee. Her position was Asst. AD for Business Affairs. I had to eliminate her role as she was a tremendous blow to our morale; among other things. The reply back was that it was going to be a 'Tom Noe' type investigation and that something could appear this weekend. My staff is saying 'bring it on' as we will reply to all of her allegations. However, no one has been contacted whatsoever. If needed, I will not remain quiet and let this person attempt to bring down our [department] and all that we have accomplished. I simply wanted you to know as this need not be one-sided. However, Joe, I am not certain if this article will occur as it is a Human Resources issue. Thank you for listening." (Plaintiff's Exhibit 15.)

{¶ 45} Plaintiff contends that the statement "she is the ultimate disgruntled employee" is not true, and that the following statement "I had to eliminate her role as she was a tremendous blow to morale; among other things" is also false because the documentation she received stated that she was terminated as the result of a merger, not because of her attitude or behaviors. In *Welling*, however, the court warned that the "requirements imposed by the Restatement make a false-light claim difficult to prove." Id. at ¶51. The court emphasized that "the statement made must be untrue [and] the information must be "publicized," which is different from "published." Id. at ¶52.

{¶ 46} According to the explanation offered by the Restatement of the Law 2d, Torts, Section 652D, Comment a, "'[p]ublicity,' as it is used in this Section, differs from

'publication,' as that term is used * * * in connection with liability for defamation. 'Publication,' in that sense, is a word of art, which includes any communication by the defendant to a third person. 'Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public."

{¶ 47} Defendant contends that plaintiff failed to prove that UT was responsible for the statements being publicized. O'Brien testified that he knew that the e-mail was a public record and that he was sending an e-mail to an employee of the newspaper; thus, plaintiff contends that O'Brien should bear responsibility for the e-mail being obtained by the reporters and published.[4] O'Brien testified that he sent the e-mail only to Joe Zerbey, who was a professional acquaintance who worked at the Blade. Even though the e-mail is addressed only to Zerbey and not those at the Blade who subsequently reported it, the court finds that defendant is arguably responsible for the publicity given to O'Brien's statements.

{¶ 48} "Another element of a successful false-light claim is that the misrepresentation made must be serious enough to be highly offensive to a reasonable person:

{¶ 49} "The rule stated in this Section applies only when the publicity given to the plaintiff has placed him in a false light before the public, of a kind that would be highly offensive to a reasonable person. In other words, it applies only when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended *and aggrieved by the publicity.* * * * The plaintiff's privacy is not invaded when the unimportant false statements are made, even when they are made deliberately. It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a

---

[4]The parties did not produce admissible evidence for the court to be able to ascertain with any certainty the manner in which the e-mail was obtained by, or conveyed to, the reporters.

cause of action for invasion of privacy.' Restatement of the Law 2d, Torts, Section 652E, Comment c." *Welling* at ¶54,55. (Emphasis added.)

{¶ 50} Defendant contends that the phrases "ultimate disgruntled employee" and "tremendous blow to our morale" do not rise to the level of being highly offensive to a reasonable person. The court agrees. Plaintiff testified that she was never disgruntled, instead she described her actions as "diligent," and that, in her opinion, such behavior was not a blow to the morale of the department. Plaintiff testified that she was shocked and devastated when she read the comments made by O'Brien. Plaintiff testified that she was also upset because her employment situation had been made public once the Blade published O'Brien's e-mail. The court finds plaintiff's testimony to be disingenuous inasmuch as plaintiff admitted that she initiated contact with newspaper reporters and provided to them the details of her employment dispute, including the fact that she suspected that the loss of her position was not a result of the merger.

{¶ 51} Defendant next argues that it is not liable to plaintiff because the statements are merely opinions held by O'Brien and that they are not statements of fact. In response, plaintiff contends that characterizing one's comments as opinion serves as a defense to defamation, but that it has not been extended as a defense to false light-invasion of privacy. Plaintiff's argument is not well-taken. In *Welling*, supra, the court stated that defendants to a false-light invasion of privacy claim "enjoy protections at least as extensive as defamation defendants." Id. at ¶58. In Ohio, "allegedly defamatory statements that constitute opinion enjoy an absolute privilege and may not give rise to a cause of action for defamation. 'Once a determination is made that specific speech is "opinion," the inquiry is at an end. It is constitutionally protected.'" *Wampler v. Higgins* (May 31, 2000), Pickaway App. No. 2000 CA 5, at 15, quoting *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 284; see also *Scott v. News-Herald* (1986), 25 Ohio St.3d 243, 250. The court finds that the two comments made by O'Brien even if they could be considered highly offensive to plaintiff are clearly O'Brien's opinions and not factual statements.

{¶ 52} For the foregoing reasons, the court finds that plaintiff has failed to prove that she was discharged or disciplined in violation of a public policy or that defendant invaded her privacy by placing her in a false light. Accordingly, judgment shall be

rendered in favor of defendant.  With respect to the court's decision, defendant's motion to dismiss is DENIED as moot.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SUZETTE FRONK

    Plaintiff

    v.

THE UNIVERSITY OF TOLEDO

    Defendant
    Case No. 2007-08473

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant.  Court costs are assessed against plaintiff.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

| | |
|---|---|
| Emily M. Simmons | Faten A. Eidi |
| Randall W. Knutti | John D. Franklin |
| Assistant Attorneys General | Richard K. Greenfield |
| 150 East Gay Street, 18th Floor | 420 Madison Avenue, Suite 1101 |
| Columbus, Ohio 43215-3130 | Toledo, Ohio 43604 |

SJM/cmd
Filed August 20, 2010
To S.C. reporter September 9, 2010